The present lawsuit was filed by Miriam Ellen Hall Mazzone, the daughter of Jesse Carl Hall and residual beneficiary of his estate, against Jesse Carl Hall's mother, Bessie Newell Hall, and three siblings of Jesse Carl Hall, two of whom, Hines Newell Hall and Mary Florence Hall, are the co-executors of his estate. Plaintiff sued for an accounting, removal of the co-executors, damages for mismanagement of estate assets, and a determination of plaintiff's interest in land located in Baldwin County. The only issue raised by defendants in this appeal is whether the trial court erred in holding that plaintiff's interest in the property in question is not subject to the quarantine rights of plaintiff's grandmother, defendant Bessie Newell Hall.
Robert Hines Hall, the husband of Bessie Newell Hall, died intestate on April 15, 1949. There is a dispute concerning the location of his last residence. Defendants claim that shortly before his death Robert Hines Hall moved from a residence known as the "D. Hall place," which was owned by a relative, and constructed a small house on a 540-acre tract of land which he owned in the Tensaw Flats area. This residence was known as the "Pace place." Plaintiff maintains that Robert Hines Hall lived at the D. Hall place at the time of his death.
There was evidence that after Robert Hines Hall's death his children agreed that all income generated by his property should go to their mother, Bessie Hewell Hall, for her maintenance and support; however, Bessie Newell Hall directed that her income go to her children so as to preserve her Social Security and Medicare benefits.
Jesse Carl Hall, a resident of Tuscaloosa, died on November 14, 1970, leaving a one-quarter interest in the Baldwin County property as an asset in his estate. In 1982, plaintiff initiated the present lawsuit. Defendants raised an affirmative defense based upon the quarantine rights of Bessie Newell Hall, Robert Hines Hall's widow. Evidence was presented both oretenus and by deposition to the trial court without a jury. The trial court found that Robert Hines Hall did not reside at the Pace place at the time of his death, and, therefore, that his widow was not entitled to any income from, and held no interest in, the property in Baldwin County in which Jesse Carl Hall's estate held an undivided one-fourth interest. The order determining the issue of quarantine was made final under *Page 410 
the provisions of Rule 54 (b), A.R.Civ.P., and all other issues in the case were referred to a special master. However, the trial court suspended the special master's report while considering several post-trial motions and also ordered that the report be suspended during the time for taking an appeal and during the pendency of an appeal.
Defendants' motion for new trial or to alter, amend, or vacate the judgment on the basis of newly discovered evidence was denied. After filing a notice of appeal, defendants, pursuant to court order, filed a supersedeas bond in the amount of $46,705, that amount being ten percent of the value of plaintiff's undivided one-fourth interest in the property.
Defendants claim that the following statute, extant at Robert Hall's death, entitles Bessie Newell Hall to possession and income from the Baldwin County property at issue:
 "The widow may retain possession of the dwelling house where her husband most usually resided next before his death, with the offices and buildings, appurtenant thereto, and the plantation connected therewith, until her dower is assigned her, free from the payment of rent."
Alabama Code of 1940, tit. 34, § 50. This is the so-called right of quarantine incidental to dower. Failure of the widow to reside on the land after the husband's death, as in the present case, does not result in the forfeiture of her quarantine rights. Smith v. Persons, 285 Ala. 48, 55,228 So.2d 806, 812 (1968); Foy v. Wellborn, 112 Ala. 160, 165,20 So. 604, 605 (1896). Furthermore, the three- and ten-year limitations on the right to have dower assigned, see Alabama Code of 1940, tit. 34, § 63, do not apply to a widow who retains possession under the right of quarantine. Williams v.Anthony, 219 Ala. 98, 99, 121 So. 89, 90 (1929).
However, the trial court held that the widow in this case was not entitled to any rights by virtue of this statute because the property in question was not "where her husband most usually resided next before his death." See Clark v. McWaters,286 Ala. 563, 564, 243 So.2d 670, 671-72 (1970). It is this finding of the trial court that is challenged on appeal.
The parties have presented a preliminary question, however, regarding the standard by which this Court is to review the finding of the trial court. Where the trial court hears oretenus evidence, its findings of fact based on that evidence will not be disturbed on appeal unless they are plainly and palpably wrong or manifestly unjust. Scarbrough v. Smith,445 So.2d 553, 555 (Ala. 1984). This Court reviews de novo findings of the trial court based upon evidence taken by deposition.Muscogee Construction Co. v. Peoples Bank Trust Co., 286 Ala. 258,261, 238 So.2d 883, 886 (1970). Where evidence on an issue is presented both orally and by deposition, the ore tenus rule affords the trial court's finding a presumption of correctness.First Alabama Bank of Montgomery v. Martin, 425 So.2d 415 (Ala. 1982); Jones v. Moore, 295 Ala. 31, 36, 322 So.2d 682, 686
(1975); Blackwell v. Sewall, 280 Ala. 359, 367, 194 So.2d 519,526-27 (1967); St. Paul Fire Marine Ins. Co. v. Johnson,259 Ala. 627, 628, 67 So.2d 896, 897 (1953); Taylor v. Burgett,207 Ala. 54, 56, 91 So. 786, 787-88 (1921).
In this case, the trial court took evidence on the issue of the last residence of Robert Hines Hall that was presented both orally and by deposition. The problem is that only one witness, Mary Florence Hall, testified orally before the trial court on this issue. Her testimony was that her father lived at the Pace place at the time of his death, an assertion contrary to the trial court's finding. Defendants argue that the ore tenus rule should not apply where the trial court's finding is contrary to all of the oral testimony. We do not agree.
The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses. In this case, the trial court observed one witness testify concerning *Page 411 
this issue and made a determination of credibility. The fact that this determination was negative does not entitle us to ignore it. The fact remains that the trial court, having heard the testimony of one witness, is in a better position to resolve conflicting evidence than are we who must rely solely
on written documents. Therefore, we accord the trial court's finding a presumption of accuracy, and we examine the record only to determine if that finding was clearly erroneous.
Mary Florence Hall testified that her father lived at the Pace place immediately prior to his death and described the house. Hines Newell Hall, albeit by deposition, also maintained that his father resided at Pace place at the time of his death, but stated that it was not generally known in the community that his father had moved to the Tensaw Flats area because his father did not want it known. Hines Newell Hall also deposed that his parents took only what they needed to the Pace place and left some of their furniture at the D. Hall place.
Similarly, Young Charles Earle testified by deposition that the Hall family vacated the D. Hall place before the death of Robert Hines Hall. Earle, who was 12 or 13 years old at the time of Robert Hines Hall's death in 1949, stated that he did not know where the Hall family lived after that and admitted that his knowledge of this event was based on conversations he overheard between members of the Tensaw community. Finally, Charles Phillips testified that Robert Hines Hall moved from the D. Hall place to a "shotgun or cottage fashion home . . . up on Holly Creek." Phillips said he saw Robert Hines Hall walking on the highway near this cottage "lots of times" before his death.
Several witnesses deposed that they never knew Robert Hines Hall to live in the Tensaw Flats area. Carol Slaughter Griffin, who visited the Hall family at the D. Hall place in the summer of 1945 or 1946 and did not recall visiting again before Robert Hines Hall's death in 1949, stated that she did not recall Robert Hines Hall living in the Tensaw Flats area. Likewise, Gladen Scott Byrne testified that to his knowledge the Hall family did not move from the D. Hall place prior to 1949. Charles Norman also stated that he did not remember Robert Hines Hall living in the Tensaw Flats area and further stated that he never knew any white people to live in the Flats.
Helen Slaughter testified as follows concerning this issue:
 "Q. Do you have any knowledge of Mr. [Robert] Hines Hall or Mrs. Bessie Hall during [Robert] Hines Hall's lifetime ever having resided up in what we are referring to as the Tensaw Flats?
"A. In here (indicating)?
"MR. BRISKMAN: Object to the form.
"BY MR. OLLINGER:
 "Q. Up in the Tensaw Flats near your land in Section 28?
 "A. No, I don't ever remember them living in there, up in there. No, I don't.
 "Q. All right. Do you ever know of them living anywhere else?
"A. Well, later — (interrupted).
"Q. During [Robert] Hines Hall's lifetime?
"A. No, not during his lifetime.
". . . .
 "Q. All right. Do you have any recollection of Mr. [Robert] Hines or Miss Bessie during [Robert] Hines Hall's lifetime ever living near Holly Creek?
 "A. Holly Creek, no. The only time, place I have known for them to live is over in back of Georgia Till's home, back in there [the D. Hall place].
". . . .
 "Q. Miss Helen, can you say with all confidence that Mr. [Robert] Hines Hall lived behind Ms. Georgia Till where you marked an `X' at the time of his death?
 "MR. BRISKMAN: I object to the form of the question. It's leading.
"THE WITNESS: Yes, he lived there."
Helen Slaughter admitted on cross-examination that her knowledge of the Hall residence was based on reputation in the *Page 412 
community and not from having visited the house. Furthermore, Mrs. Slaughter admitted that she had been involved in litigation with Robert Hines Hall's heirs concerning a right of way to her land.
George Woolf testified as follows:
 "Q. Would you mark with a well-defined `X' with that red pen where you think approximately where [Robert] Hines Hall lived in the late 1940's.
 "A. Somewhere right in this area right in there (indicating).
". . . .
 "Q. All right. Now, what was that residence known as?
"A. The D. Hall place.
"Q. The D. Hall place?
"A. All I had ever heard it called.
". . . .
 "Q. Prior to [Robert] Hines Hall's death, and this would be a point in time immediately prior to his death, do you know of Mr. [Robert] Hines Hall's residence, where he most usually resided next preceding his death?
"A. Right there (indicating).
"Q. Where you marked with an `X'?
"A. (Nods head affirmatively.)
 "Q. All right. Now, do you happen to have any knowledge whether or not Mr. [Robert] Hines Hall and Bessie Hall, during Mr. [Robert] Hines Hall's lifetime, ever lived up north of Tensaw in the area known as the Tensaw Flats?
"A. Not to my knowledge.
". . . .
 "Q. You said that you had visited in the house that was located behind Georgia Till?
"A. (Nods head affirmatively.)
"Q. All right. When did you visit there?
"A. I don't remember when.
 "Q. When was the last time that you remember, that you remember being there, that you have an independent recollection?
"A. In 1949.
". . . .
"Q. Who did you see over there?
"A. I know I talked to Carl.
"Q. Okay. That's all you saw that day?
 "A. I think Miss Bessie and probably, I didn't — (interrupted).
 "Q. When you `think' and `probably,' I want to know who you remember.
 "A. I remember it being more there and asked for [sic] — just exactly who and which one I wouldn't say.
"Q. You wouldn't say because you don't remember?
"A. That's right.
 "Q. The only one you remember talking to on that day in 1949 was Carl?
"A. Right.
"Q. Did you go in the house?
"A. Yes.
". . . .
 "Q. All right. Now, you have stated under cross-examination that you logged the entire [Robert] Hines Hall property up in the Flats. Did you during that logging operation, did you find any evidence of a residence?
"A. No."
Although some of the evidence presented by plaintiff on this issue is of doubtful probative value, there is enough evidence to support the trial court's finding that we are unable to conclude that the trial court was clearly erroneous.
Defendants next contend that the trial court abused its discretion in refusing to consider newly discovered evidence presented on their motion for new trial or for the court to alter, amend, or vacate the judgment. This evidence consisted of affidavits of two men, Levi Rogers and Dock Ganey, who claimed to have visited Robert Hines Hall at the Pace place and personally knew that to have been his last residence.
In order for a party to be entitled to a new trial on the ground of newly discovered evidence, he must show: (1) that such evidence would probably cause a different conclusion to be reached; (2) that such evidence is not merely cumulative of evidence already before the court; (3) that he *Page 413 
had no notice of the existence of the evidence; and (4) that the evidence could not have been discovered prior to trial by the exercise of due diligence. Ex parte Stanley, 255 Ala. 95,97, 50 So.2d 242, 243-44 (1950).
Regarding the requirement of due diligence, Mary Florence Hall filed an affidavit in support of the motion, alleging the following:
 "I made at the time of the pendency of this litigation, a most diligent search in an attempt to find witnesses who would have known of the residence of my father at the Old Pace Place at the time of his death in April of 1949. I inquired about Levi Rogers and was advised by members of the community that Mr. Rogers was dead. I frankly did not know that Dock Ganey was alive and his very existence escaped my mind. There were no Ganeys of this family in Tensaw when this litigation began and I had no reasonable way or expectation or even thought of contacting him. . . ."
This lawsuit was filed on June 14, 1982. Defendants raised the affirmative defense of quarantine on August 5, 1983. A hearing was set for November 21, 1983. On October 25, 1983, Mary Florence Hall was deposed, at which time the following exchange occurred:
 "Q. All right. Who is still living besides yourself; your mother, Bessie; your sister Sarah; and your brother, Newell, who you are confident would be aware and would recollect the location of this residence of [Robert] Hines Hall in Section 28 known as the Pace place?
". . . .
 "A. I really do not know because I have not surveyed to find out."
Plaintiff's counsel filed an affidavit stating that the communities of Tensaw, Rabun, Perdido, Stockton, Latham, Blacksher, and Little River are all listed in the Bay Minette telephone directory. Excerpts from that directory were attached which showed a listing for Mr. Levi Rogers and listings for several Ganeys. The affidavit further states that one of the Ganeys listed was the son of Mr. Dock Ganey.
It is clear that these two witnesses could have been discovered prior to trial if the same diligence used to locate them after the trial had been used earlier. Therefore, the trial court did not abuse its discretion in refusing to consider the affidavits.
Plaintiff argues that she is entitled to a judgment against defendants in the amount of the supersedeas bond posted by defendants pursuant to order of the trial court. Code of 1975, § 12-22-73 provides:
 "When an appeal is taken by the claimant on a trial of the right of property and the judgment is stayed by the execution of a supersedeas bond, if the appellate court affirms the judgment of the court below, it must also enter judgment against the obligors in said bond of 10 percent of the alternative value of the property as fixed by the trial court below."
We believe that this "penalty" statute does not apply in this case.
The first line of § 12-22-73 reads, "[w]hen an appeal is taken by the claimant on a trial of the right of property." The phrase "a trial of the right of property" is a term of art that defines a particular kind of suit. This kind of suit is found under Article 3 of Chapter 6 in the 1975 Alabama Code ("Trial of Right of Property") and is defined in Code of 1975, §6-6-160:
 "When an execution, attachment or other like writ, issued from any court or by any officer, is levied on personal property as to which any person not a party to the writ claims to own the title, legal or equitable, or a lien paramount to the right, title or interest in the property of the defendant in the writ, such person may try the right to such property
before the sale thereof. . . ."
Section 6-6-160 "applies only to personal property levied on under writs of execution or of attachment." Johnson v. NewEnterprise Co., 163 Ala. 463, 465, 50 So. 911 (1909). A trial of the right of property "is not an independent suit, but derives its *Page 414 
existence out of the pendency of the attachment suit." Cofer v.Reinschmidt, 121 Ala. 252, 256, 25 So. 769 (1898). This kind of suit is statutory and consequential in nature and cannot exist without the levy of a writ of attachment. Cofer, supra.
Although § 12-22-73 and § 6-6-160 do not cross-reference each other, we believe that the legislative intent behind § 12-22-73
was to provide a penalty provision when a claimant to property misused § 6-6-160. Since the suit in this case was not "a trial of right of property," the plaintiff is not entitled to the ten percent penalty found in § 12-22-73.
Let the judgment of the trial court be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and HOUSTON, JJ., concur.