946 So.2d 480 (2006)
Kelly Frances PARKER
v.
Robert Charles PARKER.
Robert Charles Parker
v.
Kelly Frances Parker.
2040696.
Court of Civil Appeals of Alabama.
June 23, 2006.
*481 Douglas Corretti of Corretti, Newson & Hawkins, Birmingham; and Donna Richardson Shirley, Birmingham, for appellant/cross-appellee Kelly Frances Parker.
Scott Gilliland and Kim Davidson of Davidson, Gilliland, Kinnell & Phillips, P.C., Birmingham, for appellee/cross-appellant Robert Charles Parker.
CRAWLEY, Presiding Judge.
Kelly Frances Parker ("the mother"), sued her husband, Robert Charles Parker ("the father"), for a divorce in July 2003, alleging, in part, an incompatibility of temperament and an irretrievable breakdown of the marriage as grounds for the divorce. The trial court entered a final judgment on April 19, 2005, divorcing the parties, awarding custody of the parties' two children to the father, granting the mother visitation rights, and dividing the marital property; the trial court reserved ruling on the issue of child support due to the mother's "apparent" lack of income.
The mother timely filed a notice of appeal on April 22, 2005, three days after the entry of the judgment. Thirty days after the entry of the judgment, the father filed *482 a postjudgment motion to alter or amend the judgment. The trial court denied the father's postjudgment motion 62 days later, on July 20, 2005. The father then cross-appealed, timely filing his own notice of appeal 14 days later, on August 3, 2005.

I. Factual Background
The parties married in January 1991. The parties had two daughters born to them during the marriage; the older daughter was born in 1994, and the younger daughter was born in 1997. At the time of the trial, the father was 34 years old, and the mother was 38 years old.
The parties have been separated since 1998. From the time of the parties' separation until two months before trial, the mother has had physical custody of the children, without a court order, but with the father's consent. The father has had custody of the children on the weekends (at least for several years), during spring break, and one month during the summer. The mother has custody of her sister's child, who was placed with her seven years before the trial in this matter by the Georgia counterpart to the Alabama Department of Human Resources ("DHR"), with the cooperation of DHR.
The mother testified that the father was abusive and that he had struck her on several occasions. On the other hand, the father testified that the mother had struck him many times and that she had done so as often as once or twice a week. The father also testified that when he had struck the mother it was in self-defense.
Testimony at trial by several witnesses indicated that the mother has a history of crude confrontations with neighbors, other parents at the children's school, and school officials. One neighbor testified that she had been confronted by the mother, whom she had never met before, as she was leaving her house. The neighbor stated that the mother had approached her and, using vulgar language, had accused her of having sexual intercourse with the father. The neighbor testified that, at the time, the mother was with two children whom the neighbor assumed to be the mother's children.
The principal at the school the parties' children attended testified that she discussed with the mother several concerns the principal had regarding incidents at the school. The principal testified that one incident concerned the mother's blocking traffic as she confronted another parent over problems one of the parties' children had with that parent's child in school. Another incident concerned the mother's allegedly berating another child and that child's mother over the telephone, and then in person. Following an additional incident in which the mother went to the principal's office and loudly complained about the mistreatment she felt the parties' children were receiving from other children in school, the principal wrote a letter to the mother that provided rules for the mother's conduct at the school campus, the violation of which, the principal warned, could "result in [her] arrest by the Hoover Police Department." The principal wrote that she was prompted to take these actions by "recent events that have occurred during the past two weeks involving [the mother] on Green Valley Elementary school grounds as well as the fact we have students afraid to come to school because of these incidents." The principal testified that the mother is the only parent to whom she has ever had to write such a letter.
Additionally, the parties' children were often absent from school without an excuse. One of the children, the father testified, was absent from school 14 times during the then current school year, while the other child was absent 22 times.
*483 Although there was testimony at trial indicating that the father was not an ideal parent, there was also ample testimony indicating that the father loved his children and made a concerted effort to provide for their well-being. The father testified that after the parties' separation, he voluntarily paid child support to the mother in the amount of about $750 to $800 a month. Eventually, the father testified, he had to declare bankruptcy. At the time of the trial, the father was paying $615 per month in child support and living in a small efficiency apartment. Evidently concerned that he would need more living space, the father stated that he had recently located an available two-bedroom apartment into which he and the children could move in the event he obtained custody of the children and no longer had to pay child support to the mother.
The father's testimony indicates that he provided more than monetary support for the children; he would often take the children on trips to the beach, to Chattanooga, Tennessee, to the Space and Rocket Center in Huntsville, and to Gulf Shores during the time he had with them. The father also cooked, cleaned, and otherwise provided for the children when they were with him. Indeed, the father's conduct toward the children was such that the mother testified that she has never expressed any objection to the children visiting the father and if she were awarded custody that she would have no problem with the children continuing to visit the father.
Regarding the parties' employment, the father testified that he had been employed at an automobile dealership for the seven years preceding the trial as an automotive technician. He also testified that he did not graduate from high school and that he has not obtained a GED. He earns an average of $3,200 per month.
The father also testified that he leaves for work at about 7:30 in the morning and returns home by about 6:00 at night. Acknowledging the difficulty in caring for the children while he worked, the father testified that he has looked into some church programs and after-school programs for the children. The father stated on his CS-41 Child Support Obligation/Income Affidavit form that his monthly employment income was $3,567.75, and that he pays $569 per month for the children's health insurance.
Although the mother stated on her CS-41 form that she was unemployed, she also, on the same form, indicated that her income from employment was $975 per month. Later, at trial, the mother testified that, at the time she completed her CS-41 form, she was, in fact, employed. Her testimony was as follows:
"Q. [attorney for the father] Do you recall signing a CS-41 on your income and your employment information on January the 12th [2005]?
"A. [the mother] Yes, ma'am.
"Q. Do you recall signing an affidavit stating that you were not currently employed?
"A. Yes, ma'am.
"Q. But you were?
"A. At that time, no, I wasn't. I don't know the exact date I started babysitting. I was not employed when I came to court.
". . . .
"Q. [attorney for the father] Well, January 12th was like a Wednesday, so do you recall also on your affidavit you didn't have any employment wages?
"A. [the mother] Yes, ma'am.
"Q. So January 12th, according to your witness, you were being paid $150 a week to work for her?
"A. No, ma'am, I had not gotten paid.

*484 "Q. No. You were working for her, according to her testimony; is that correct?
"A. Yes, ma'am.
"Q. And she was paying you $150 a week?
"A. Yes, ma'am.
"Q. And the affidavit that you signed with the Court did not reflect any income from babysitting?
"A. Well, actually in all reality Ms. Gonzalez didn't pay me until the end of the first month when I started babysitting for her because she didn't have the money.
"Q. No, ma'am, I didn't ask you that. I said that document does not reflect any money from your job that you testified to that you started at the first of January; is that correct?
"A. Yes, ma'am.
"Q. And not only that, you checked the box on the affidavit saying you were not currently employed as of January 12, 2005?
"A. Yes, ma'am.
"Q. And that's aI'm sure you were explained that this was sworn to be true and correct when you signed it?
"A. Yes, ma'am.
"Q. So there have been two occasions at this point that the Court has been told information by you that was not correct?
"A. Can I speak?
"THE COURT: That's yes or no.
"Q. [attorney for the father] You can answer the question?
"A. Yes."
The mother also testified that at the time of the trial she was working as a babysitter:
"A. [the mother] Iwell, I babysat a little bit [in 1998]. I don't know if that counts really as a job, but I did babysit for children in the apartment complex.
"Q. [attorney for the mother] Well, aren't you now babysitting?
"A. Yes, sir.
". . . .
"Q. [attorney for the mother] And you intend to continue to do that?
"A. [the mother] Yes, sir.
"Q. And are you paid for that?
"A. Yes, sir.
"Q. How much do you receive for that babysitting?
"A. $150 dollars a week.
"Q. And that's being paid on a regular basis; is that correct?
"A. Yes, sir."
The above testimony was not in isolation; later, the mother testified as follows:
"Q. [attorney for the mother] Do you have a judgment as to how much you've worked this year, 2005, for three months and five days?
"A. [the mother] For about two and-a-half months.
"Q. How many was that?
"A. Two and-a-half months.
"Q. And what have you done?
"A. Babysat."
Additionally, the mother's father testified that, although the mother has worked at various jobs over the years, she has never been self-supporting to the point he did not contribute to her income.
On April 19, 2005, the trial court entered its judgment, in which it awarded custody of the children to the father and visitation to the mother. The trial court's judgment also stated:
"The issue of child support is reserved due to the [mother's] apparent lack of income.

*485 "That reference is hereby made in this Judgment to a separate order entitled, Order of Continuing Income Withholding for Support, pursuant to Code of Alabama, 1975 Title 30-3-60 et seq. which is specifically incorporated herein as apart of this Court's order and decree in this cause, and this order shall not be served."
The "Order of Continuing Income Withholding for Support," referenced by, and incorporated into, the judgment is a form in which, next to a blank space where the trial judge could write the name of the mother's employer, the trial judge wrote: unemployed.
The mother appealed, asserting that the trial court erred in awarding custody of the children to the father. After his postjudgment was denied by the trial court, the father cross-appealed, asserting error as to the issue of child support.

II. Discussion

A. Jurisdictional Issues
"It is well settled law that `jurisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu.'" Pace v. Utilities Bd. of Foley, 752 So.2d 510, 511 (Ala.Civ.App.1999) (quoting Singleton v. Graham, 716 So.2d 224, 225 (Ala.Civ.App. 1998)). We also note that an untimely filed notice of appeal results in a lack of appellate jurisdiction, which cannot be waived. Luker v. Carrell, [Ms. 2040318, March 31, 2006] ___ So.2d ___, ___ (Ala. Civ.App.2006). Additionally, "[t]he question whether a judgment is final is a jurisdictional question, and the reviewing court, on a determination that the judgment is not final, has a duty to dismiss the case." Hubbard v. Hubbard, 935 So.2d 1191, 1192 (Ala.Civ.App.2006).
This case presents several interesting jurisdictional questions. The first is whether the father's postjudgment motion, filed after the mother filed her notice of appeal, held the mother's appeal in abeyance until the trial court ruled on the postjudgment motion. We have frequently addressed the opposite situation, in which the filing of a postjudgment motion predates the filing of a notice of appeal. In this case, if the filing of the father's post-judgment motion did not hold the appeal in abeyance, then one consequence would be that his notice of appeal would have been untimely, coming several months after the mother filed her notice of appeal instead of within the required 14 days. The comments to Rule 4(a)(5), Ala. R.App. P., note that the rule alters the procedure established by several cases which, among other things, held that a timely filed notice of appeal is subject to "ouster" by the filing of an opponent's postjudgment motion. However, we note that such language does not mean that the effect of Rule 4(a)(5) in a situation like this is to vest jurisdiction in an appellate court. Rather, instead of "ousting" the appeal, the rule specifically states that the appeal "shall be held in abeyance until all post-judgment motions . . . are ruled upon." In other words, the appeal is temporarily suspended pending the resolution of the postjudgment motion by the trial court. Thus, the mother did not need to refile a notice of appeal after the father's postjudgment motion was denied, and the father's notice of appeal, filed 14 days after the resolution of his postjudgment motion, was timely filed, as were the briefs the parties submitted.
The second jurisdictional question we must resolve is whether the trial court's judgment is a nonfinal judgment. The trial court's judgment stated, "[t]he issue of child support is reserved due to the [mother's] apparent lack of income."
*486 We held in Tomlinson v. Tomlinson, 816 So.2d 57 (Ala.Civ.App.2001), that the trial court's judgment was nonfinal when the trial court reserved ruling on the issue of child support, when purportedly entering its "final" judgment, to allow the parties to submit the necessary child-support forms required by Rule 32(E), Ala. R. Jud. Admin. In Reid v. Reid, 844 So.2d 1212 (Ala.Civ.App.2002), we held that the trial court's judgment was nonfinal when the trial court reserved ruling on the issue of child support pending the mother's taking an examination to obtain a nursing license, after which the trial court would determine how much income to impute to the mother for the purpose of calculating her child-support obligation.
In this case, however, the trial judge has "reserved" ruling on the issue of child support because of the mother's apparent lack of income. Thus, this case is distinguishable from the above-cited cases because the trial court did not reserve the ruling on the issue of child support pending the occurrence of some specific event, like the submission of child-support forms in Tomlinson, supra, or obtaining the results of a nursing-license examination in Reid, supra. In this case, the purported "reservation" of the issue of child support does not change the fact that the trial court's judgment does not award child support; therefore, it is as final as any child-support judgment can be.

B. Substantive Issues

1.
The mother argues in her briefs to this court that the trial court erred in awarding custody of the children to the father.[1] In doing so, the mother draws this court's attention to certain facts, including the fact that the mother was granted custody of her sister's daughter by the Georgia counterpart to DHR, working in conjunction with DHR, and the fact that the mother had physical custody of the children from the time the parties separated in 1998, until two months before the trial.
"`In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. The trial court's overriding consideration is the children's best interests and welfare. The factors that enter into the court's custody determination include the child's age and sex and each parent's ability to provide for the child's educational, material, moral, and social needs. Likewise, it is proper for the court to consider the "characteristics of those seeking custody, including age, character, stability, mental and physical health . . . [and] the interpersonal relationship between each child and each parent."'
"Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994)(quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981)) (internal citations omitted). In addition, our review of custody determinations based on ore tenus evidence is quite limited; the trial court's custody judgment is presumed correct and should be reversed only if the judgment is plainly and palpably wrong. Bates v. Bates, 678 So.2d 1160, 1161-62 (Ala.Civ.App.1996). `"The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.'" Ex parte Anonymous, 803 So.2d 542, 546 *487 (Ala.2001)(quoting Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986))."
Smith v. Smith, 887 So.2d 257, 262 (Ala. Civ.App.2003). Applying the above factors to this case, we cannot say that the trial court was plainly and palpably wrong in awarding custody of the children to the father. There is evidence in this case that supports the trial court's conclusion that the children's best interests would be served by placing them with the father.
For example, there is evidence indicating that the mother was less mature than the father and, therefore, that factors such as the parties' "character, stability, [and] mental . . . health" weighed in favor of awarding custody to the father. The testimony of the mother's neighbor was that the motherin the presence of children angrily accused the neighbor of having sex with the father. The children's principal testified that the mother repeatedly caused disruptions on the school grounds to the point that a letter had to be written to the mother providing rules for her conduct on the school grounds. Thus, the trial court could have concluded that the mother frequently reacted to problems in her own or the children's lives in an unseemly manner and that it would not be in the best interests of the children to be in her custody. The fact that the mother was awarded custody of her sister's child does not mean that, between herself and the father in this case, the children's best interests would be served by being placed in her custody.
The father, although not wealthy, appears capable of providing for the children emotionally and economically. He takes the children on vacations regularly, and he cooks and cleans for them when they stay with him. Despite some testimony indicating that the father frequently had angry outbursts toward the mother, there is no indication that he exhibits such outbursts to the children. In fact, the mother even testified that she has never objected to the father's visiting with the children. Additionally, the father has held a steady job as an automotive technician for seven years preceding the trial. He paid voluntary child support for several years, he pays for the children's medical insurance, and he has made arrangements to get a larger apartment to house the children. Thus, applying the ore tenus standard of review, we cannot say that the trial court in this case was plainly and palpably wrong in awarding of custody to the father.

2.
In his cross-appeal, the father argues that, the trial court's judgment in regard to child support was not final; and alternatively, in the event we determine the judgment was final, he argues that the trial court erred in not following the child-support guidelines established by Rule 32, Ala. R. Jud. Admin. As we previously determined, the trial court's judgment "reserving" a ruling on the issue of child support was in fact a final judgment.
The father's second argument is that the trial court's failure to award child support due to the mother's "apparent lack of income" was an abuse of the trial court's discretion. More specifically, the father argues that the trial court did not explain why it chose to deviate from the child-support guidelines, and thus it did not comply with the mandate of Rule 32, Ala. R. Jud. Admin.
We agree with the father. The trial court's judgment did not award the father any child support from the mother because of her "apparent lack of income."
Rule 32(A)(ii), Ala. R. Jud. Admin., requires a trial court to justify why application of the child-support guidelines would be unjust or inequitable. "`A trial court's failure to follow the guidelines or to make written a finding that application of *488 the guidelines would be unjust, is reversible error.'" Robinson v. Robinson, 795 So.2d 729, 734 (Ala.Civ.App.2001)(quoting State ex rel. Waites v. Isbell, 718 So.2d 85, 86 (Ala.Civ.App.1998)). Were we to construe the "apparent lack of income" phrase to mean that the mother is unemployed and thus cannot pay child support, then perhaps we could affirm the trial court's judgment as to the issue of child support as being in compliance with Rule 32(A)(ii).
However, the "apparent lack of income" language does not indicate whether the trial court made such a factual finding. Either the mother had income or she did not. The mother's CS-41 form filed with the trial court two months before the trial indicates that the mother's income was $975 per month. Additionally, the mother never stated in her testimony that she has no income. Indeed, the mother stated at trial that she was currently employed as a babysitter earning $150 per week on a regular basis, and that she had been employed as a babysitter for two and a half months during the three months preceding the trial.
Furthermore, the mother admitted she completed her CS-41 form inaccurately when she marked that she was unemployed. On the same form she also noted that she was earning $975 per month in employment income.
One could construe the trial court's judgment to mean that the lack of an award of child support was because the trial court found that the mother lacked adequate income. However, such a generous interpretation reads more into the judgment than is there, and we decline to construe the judgment in such a way. Certainly, the trial court did not make any "written finding on the record indicating that the application of the guidelines would be unjust or inappropriate," as required by Rule 32(A), Ala. R. Jud. Admin., and which would have been sufficient to rebut the presumption that the child-support guidelines should be followed.
Importantly, Rule 32(A)(ii), Ala. R. Jud. Admin., provides the only potential basis under which the trial court's judgment in this case could comply with the requirement to justify a deviation from the child-support guidelines. It provides that a written finding indicating that the application of the guidelines would be unjust or inappropriate is sufficient to rebut the presumption that the guidelines provide the correct amount to be awarded, if that finding is based upon
"[a] determination by the court, based upon evidence presented in court and stating the reasons therefore, that application of the guidelines would be manifestly unjust or inequitable."
Rule 32(A)(ii), Ala. R. Jud. Admin. At trial, the mother testified that she earned about $600 per month from babysitting; she also declared on her CS-41 form that she earned $975 per month from her employment. Even the mother, in her reply brief to this court, concedes that "[d]uring the trial [the mother] testified she made $150.00 per week babysitting for her neighbor." Additionally, there is evidence indicating that the mother's parents contribute to her income. Rule 32(B)(2)(a), Ala. R. Jud. Admin., defines "gross income" to include income from any source, including among other things, gifts. In accordance with this rule, the trial court in this case must take into account all sources of income to the mother when computing her support obligations,[2] and it has no *489 discretion in this matter. Massey v. Massey, 706 So.2d 1272, 1274 (Ala.Civ.App.1997)(citing Rule 32, Ala. R. Jud. Admin., and Rogers v. Sims, 671 So.2d 714, 716 (Ala.Civ.App.1995)).
As our supreme court observed in Ex parte Moore, 805 So.2d 715, 719 (Ala.2001):
"The figure calculated by using Form CS-42 is accorded a rebuttable presumption that it is the correct amount of child support to be awarded. . . . Rule 32(A), Ala. R. Jud. Admin.; Rolen v. Pickering, 628 So.2d 850 (Ala.Civ.App. 1993). . . . In addition, a trial court can make a child-support award that deviates from the recommended figure as calculated according to the Guidelines, but to support such a deviation the court must make written findings of fact based upon evidence presented to it. Rule 32(A)(1); State Dep't of Human Res. v. J.B., 628 So.2d 889 (Ala.Civ.App.1993)."
If the mother's income changed in the two months between when she submitted her CS-41 form and the trial, then she should have resubmitted a new form, and the trial judge should have completed a new CS-42 form. The only CS-42 form in the record was completed by the trial judge at the time the parties submitted their CS-41 forms, and it indicates that the father is the one paying child support.
As in Robinson, we are unable to determine how the trial court made its calculations, or lack of calculations in this case, concerning the mother's child-support obligations; therefore, we are compelled to reverse the trial court's judgment as to this issue and to remand this case. 795 So.2d at 733. In short, the trial court's judgment denying any child support to the father because of the mother's "apparent lack of income" does not comply with Rule 32, Ala. R. Jud. Admin.

III. Conclusion
We affirm the trial court's judgment as to the award of custody to the father. However, because the trial court did not make a clear factual finding that complies with Rule 32, Ala. R. Jud. Admin., in regard to child support, we reverse the trial court's judgment as to that issue and remand the case so that the trial court may determine whether such a finding is warranted, and, if so, justify in writing the reason why application of the child-support guidelines would be "unjust or inappropriate."
The father's request for an attorney fee on appeal is denied.
APPEALAFFIRMED.
CROSS-APPEALREVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, PITTMAN, and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result in part and dissents in part, with writing.
MURDOCK, Judge, concurring in the result in part and dissenting in part.
I concur in the result reached by the main opinion except with respect to that opinion's reversal of the trial court's judgment insofar as it declined to award child support in this case. In my opinion, the trial court's judgment was sufficient to satisfy the requirements of Rule 32(A)(ii), Ala. R. Jud. Admin., and I therefore respectfully dissent as to the reversal of the judgment in that regard.
NOTES
[1] The mother also argues in her reply brief that the father's initial brief was untimely filed. However, because the father's brief was filed 21 days after the supplemental clerk's record was certified as complete, the father's brief was timely.
[2] Rule 32(B)(2)(b) specifically excludes from "gross income" "child support received for other children or benefits received from means-tested public assistance programs, including, but not limited to, Aid to Families with Dependent Children, Supplemental Security Income, food stamps, and general assistance."