THOMAS, Judge.
J.H. (“the father”) and A.C. (“the mother”) are the unmarried parents of T.L.C. (“the son”), who was born in August 2006. The father is also the father of M.E.H., *190 who was born in April 2010 and M.F.H., who was born in February 2012. K.H., the father’s wife, is the mother of M.E.H. and M.F.H. (“the daughters”).
On October 21, 2015, the Cullman County Department of Human Resources (“DHR”) petitioned the Cullman Juvenile Court to terminate the parental rights of the father and the mother to the son (case number JU-09-173.05) and of the father and K.H. to M.E.H. (case number JU-11-240.04) and M.F.H. (case number JU-14-300.02). After a trial on April 11, 2016, the juvenile court entered three separate judgments on April 18, 2016, terminating the father’s and the mother’s parental rights to the son and the father’s and K.H.’s parental rights to the daughters.[1] The mother filed a notice of appeal seeking our review of the judgment terminating her parental rights to the son in appeal number 2150701. The father did not file a notice of appeal regarding the judgment terminating his parental rights to the son; however, he filed notices of appeal seeking review of the judgment terminating his parental rights to M.E.H. in appeal number 2150689 and seeking review of the judgment terminating his parental rights to M.F.H. in appeal number 2150690. On August 23, 2016, this court consolidated the three appeals.
The Mother’s Appeal
The juvenile court entered its judgment in case number JU-09-173.05 on April 18, 2016. The mother filed a post-judgment motion seeking to alter, amend, or vacate that judgment on April 29, 2016, which is within the 14 days allowed by the Rules of Juvenile Procedure. See Rule 1(B), Ala. R. Juv. P. (“All postjudgment motions ... must be filed within 14 days after entry of order or judgment and shall not remain pending for more than 14 days.”). The juvenile court denied the mother’s postjudgment motion in case number JU-09-173.05 on May 4, 2016. The mother, therefore, had 14 days, or until May 18, 2016, to file a notice of appeal of the May 4, 2016, denial of her post-judgment motion filed in case number JU-09-173.05. Rule 4(a)(3), Ala. R. App. P. (appeals from judgments of a juvenile court must be filed within 14 days). The mother filed her notice of appeal on May 19, 2016. Although the mother had filed in the juvenile court a motion to proceed in forma pauperis on May 18, 2016, we have explained that, even when such a motion indicates a desire to file a notice of appeal, “[a] motion to proceed in forma pauperis is not a postjudgment motion that tolls the time for filing a notice of appeal.” A.J. v. Cullman Cty. Dep’t of Human Res., 112 So.3d 51, 53 (Ala. Civ. App. 2012).
“ ‘The timely filing of [a] notice of appeal is a jurisdictional act.’ Rudd v. Rudd, 467 So.2d 964, 965 (Ala. Civ. App. 1985); see also Parker v. Parker, 946 So.2d 480, 485 (Ala. Civ. App. 2006) (‘an untimely filed notice of appeal results in a lack of appellate jurisdiction, which cannot be waived’).”
Kennedy v. Merriman, 963 So.2d 86, 88 (Ala. Civ. App. 2007). Because the mother’s appeal was untimely for the foregoing reasons, we dismiss appeal number 2150701.
The Father’s Appeals
Appeal numbers 2150689 and 2150690 were timely filed. The juvenile court entered its judgments in case numbers JU-11-240.04 and JU-14-300.02 on April 18, 2016, and the father filed postjudgment motions in both actions on April 28, 2016. The juvenile court denied the father’s post-judgment motion in case number JU-11-240.04 on May 4, 2016, and it denied the father’s postjudgment motion in case num *191 ber JU-14-300.02 on May 9, 2016. On May 16, 2016, the father filed timely notices of appeal in both actions.
The father seeks this court’s review of whether the juvenile court “erred in terminating [his] parental rights to the [daughters] and [the son] where [the father] demonstrated sufficient parenting skills for a subsequent child in [his] custody.”[2] Although the father has included the son in his issue statement, the- father did not file an appeal in case number JU-09-173.04; thus, the judgment terminating his parental rights to the son is not a 'subject of the father’s appeals. The father cites Bowman v. State Department of Human Resources, 534 So.2d 304, 305 (Ala. Civ. App. 1988), for his argument that the juvenile court failed to consider evidence presented regarding his current conditions or regarding his conduct relating to his ability or willingness to care for the daughters.
“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala. Civ. App. 2007). Under express direction from our supreme court, in termination-df-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when tde trial court bases its decision on conflicting ore ténus evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala. 2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala. Civ. App. 2007)(foot-note omitted).
The record reflects that DHR had first become involved with the then 20-year-old father in 2010, when DHR received reports that M.E.H., who was an infant, had a skin irritation caused by numerous flea bites. Dr. Barry Wood, a psychologist, testified that he had evaluated the father in 2010, and, according to Dr. Wood, the father had slightly lower-than-average intelligence, had suffered from one or more learning disabilities and a personality disorder-, and had abused illegal substances since he was 14 years old.
Amy Olivér, a DHR employee, testified that DHR again became involved with the family in 2013 when neither K.H. nor the daughters were living with the father. Oliver testified that DHR had received reports that K.H. had not properly supervised the daughters and that a neighbor had sexually abused M.E.H, Oliver testified that, in May 2013, the daughters had been removed from KH.’s custody and had begun living with the father, who was also caring for the son. Oliver testified that DHR had provided various services to the father; however, the daughters were removed and placed in the custody of DHR in May 2014 because the son had attempted to start fires in the house,[3] the-father had allegedly physically abused the son, the father “moved around a lot” and had léft the daughters in the care of others, the *192 father had failed to stay on his “mental-health medication,” and DHR had received reports that the father was using methamphetamine. Furthermore, the .father admitted that, against DHR’s instructions, he had twice taken the daughters to a home where a registered sex offender lived.
Summer Gibson, a DHR employee, testified that, in May 2014, DHR had learned from the father’s mother that the father had suffered from mental-health issues since his childhood. Gibson said ..that the father had had a long history of psychiatric hospitalizations and that the father’s mental capacity was “just a little bit slower.”
Dr. Wood reevaluated the father in November 2014, which was 17 months before the termination-of-parental-rights trial. At that time, the daughters had been living with foster parents for six months. Dr. Wood testified that, in conducting a personalty test, he had accommodated the father by reading aloud the questions on the test, which, Dr. Wood thought, might enhance the father’s ability to respond to the questions; however, Dr. Wood had determined that the test results were invalid because the father’s answers were “chaotic,” which had indicated to Dr. Wood that the father had been manipulative or unwilling to submit to.the personality test. Dr. Wood said that the father’s progress from 2010 to 2014 had been “disappointing.”
However, Dr. Wood testified that the father’s claim of a “thought disorder,” like bipolar disorder, was more likely a “pursuit of a secondary gain,” which, Dr. Wood said, was access to disability compensation. Regardless, according to Dr. Wood, the father had “a host of problems,” including a propensity for physical aggression, hubris, a lack of insight, a failure to respond to recurrent feedback from DHR, methamphetamine abuse, and the experience of withdrawal symptoms when he was not using illegal substances. Dr. Wood testified:
“I looked at all of that information together and reports that he, you know, exhibited physical aggression with [the son]. So when I looked at all of this information together, basically I arrived at the idea that he had a personality disorder with mixed features, narcissism, but perhaps primarily anti-social features. That’s what I think was going on. I didn’t think it was schizophrenia. I didn’t think it was schizoaffective. I didn’t think it was even bipolar. I thought it was a protracted stimulant, amphetamine history interplayed ... with a personality disorder that developed at least by the time he was in mid-adolescence and persisted and that was basically my conclusion. So for those reasons and the drug relapse and so forth, I was not optimistic at the end of the second evaluation.

a

“There are no real local treatments for personality disorder. It is really sort of a[n] embedded distorted way of looking at yourself and other . people in the world. It also involves impulsivity, poor judgment. When you look at all of that information and the restrictive amount of time that DHR has to intervene, the long history here of having seen him now, you know, four years apart and not seeing a real significant progress, there weren’t any recommendations that I could really come up with. I have some that I have put forward, but I felt that the core problem, which is his personality disorder, was not going to resolve in a—you know, if ever, but ’certainly not within a time frame that would avail itself within DHR limits.
[[Image here]]
“[The father] said he was convicted of drug paraphernalia, possession of meth *193 amphetamine during 2008. He reported he was convicted of writing bad checks on several occasions during 2009. And he was sentenced to probation for assault during 2012. All of these cumulative factors weigh together to support that diagnosis of personality disorder.”
The father testified that his last positive drug screen had occurred in September 2015. He admitted that he had not completed drug-rehabilitation classes as requested by DHR, and, according to the father, he did not need to participate in drug-rehabilitation classes because he was no longer abusing drugs. The father testified that he wanted try to “better [him]self and be a better father. Go to school, get a better education, try to get a better job, get off my check.”
“As this court has noted, the question whether a parent has truly and completely rehabilitated so as to resume the custody of a child is a question of fact to be determined by the juvenile court. T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1199 (Ala. Civ. App. 2008).
“‘If the juvenile court is convinced from its observations that the parent acted shortly before the termination-of-parental-rights hearing so as to make it appear that he or she was addressing or had resolved identified obstacles to reunification but that, in reality, the barriers to reunification had only been temporarily removed or merely hidden, the juvenile court may conclude that grounds for termination still exist.’
“J.W.M. v. Cleburne County Dep’t of Human Res., 980 So.2d 432, 438-39 (Ala. Civ. App. 2007)(plurality opinion).”
R.L.M.S. v. Etowah Cty. Dep’t of Human Res., 37 So.3d 805, 811 (Ala. Civ. App. 2009).
When deciding whether grounds to terminate parental rights exist, the juvenile court is not limited to evidence of current conditions; it may also consider the past history of the parent. Ex parte State Dep’t of Human Res., 624 So.2d 589, 593 (Ala. 1993). From the evidence regarding the father’s past history, most of which was undisputed, the juvenile court reasonably could have inferred that the father had suffered from a long-standing inability to discharge his responsibilities to and for the daughters. The juvenile court also reasonably could have determined that the circumstances existing at the time of the trial could not correct the father’s mental-health issues that jeopardized the health, safety, and welfare of the daughters.
Based on our limited standard of review, this court may not reweigh the evidence and substitute our opinion for that of the juvenile court; instead, this court must affirm the judgment when it is supported by clear and convincing evidence that is sufficient to sustain the juvenile court’s findings. See J.C., supra. Accordingly, we do not agree that the judgments terminating the father’s parental rights should be reversed due to the alleged failure of the juvenile court to consider the current conditions of the father.
2150689—AFFIRMED.
2150690—AFFIRMED.
2150701—APPEAL DISMISSED.
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.

. K.H. did not file notices of appeal and is not a party to these appeals.

. Although the father and K.H. are' not divorced, at the time of the termination-of-parental-rights trial, the father had been living with- another woman in Zellwood, Florida. There is one child of that relationship.

. Testimony indicated that the son had been diagnosed with a number of mental-health issues.