This appeal, which was transferred from the Alabama Supreme Court pursuant to § 12-2-7(6), Ala. Code 1975, concerns the proper venue of, and the qualifications of an executor in, a case involving the administration of a decedent's estate.
In September 2003, the decedent, Marian E. Hawkins, died in Birmingham, Alabama. *Page 782 
In October 2003, Shirley Scroggins, Hawkins's daughter, petitioned the Jefferson Probate Court to admit to probate what purported to be Hawkins's will; later that month, Scroggins filed a motion seeking a preliminary injunction to prevent Hawkins's grandson, Jeffrey Barron, from spending funds from a bank account that, she contended, was property of Hawkins's estate and seeking to disqualify him from serving as executor of the estate. In December 2003, Barron filed a motion seeking the transfer of the case to Etowah County, where Hawkins had lived for much of her life. After an ore tenus proceeding, the probate court entered a six-page judgment on March 31, 2004, admitting the will to probate. As a component of its judgment, the probate court determined that Hawkins had been a resident of Jefferson County at the time of her death (and that venue was therefore proper in Jefferson County) and that Barron was disqualified to serve as executor of Hawkins's estate; the probate court appointed the Jefferson County general administrator to serve as the estate's personal representative.
Barron filed a notice of appeal on May 12, 2004; his principal contentions on appeal are that venue was proper only in Etowah County and that he was the joint owner of a bank account as to which the signature card listed both Hawkins and Barron as signatories; derivatively, Barron has also challenged the appointment of the county general administrator as the personal representative of Hawkins's estate. Because Barron has appealed from a judgment of the probate court that, among other things, admitted Hawkins's will to probate and declared Barron unfit to serve as executor, we conclude, contrary to Scroggins's arguments, that the judgment is final and will support an appeal.See Smith v. Chism, 262 Ala. 417, 419, 79 So.2d 45, 46-47
(1955); see also Ala. Code 1975, § 12-22-21(2) (indicating that an appeal will lie from the probate court's denial of an application to serve as executor). In addition, and again contrary to Scroggins's contentions, Barron's having filed a notice of appeal to the Supreme Court within 42 days of the entry of the probate court's judgment complied with Rule 4(a)(1), Ala. R.App. P., and Ala. Code 1975, § 12-22-21, regardless of any shorter time limitations in § 12-22-21 applicable to appeals tocircuit court.
Because the probate court's judgment is based, in part, upon testimony adduced at an ore tenus proceeding, we presume its judgment to be correct, and we will not reverse its judgment unless it is "palpably erroneous." Cox v. Logan, 262 Ala. 11,13, 76 So.2d 169, 171 (1954). A more recent statement of the "ore tenus" rule, as applicable in an appeal from a probate court's judgment, appears in Craig v. Perry, 565 So.2d 171, 175 (Ala. 1990) (citations omitted):
 "[W]hen a court hears ore tenus evidence in a nonjury case, its ruling based on that evidence is presumed correct and will be overturned only if clearly erroneous or manifestly unjust. Its findings of fact will not be disturbed on appeal if they are supported by the evidence or any reasonable inference therefrom. The presumption of correctness is especially applicable where . . . the evidence was conflicting. The weight to be given the witnesses' testimony [is] for the trial judge, because he had the opportunity to view the witnesses and their demeanor."
The first issue raised by Barron concerns the proper venue of the proceeding. Under Ala. Code 1975, § 43-8-162(1), a proceeding to secure the admission of a will to probate must be filed in the probate court of the county in which a testator or *Page 783 
testatrix was an "inhabitant" at the time of his or her death. There has been very little appellate consideration of the meaning of "inhabitant" in this section, which has appeared in every Alabama Code since 1852, but those cases that address the issue equate "inhabitant" with "domiciliary resident," i.e., "one who has his domicil [domicile] in a given county." Merrill's Heirsv. Morrissett, 76 Ala. 433, 437 (1884); accord, Ambrose v.Vandeford, 277 Ala. 66, 167 So.2d 149 (1964). In turn, "[t]he word `domicil' may be defined to be a residence at a particular place, accompanied by an intention, either positive or presumptive, to remain there permanently, or for an indefinite length of time." Morrissett, 76 Ala. at 437. Moreover, "where a person has actually removed from his original domicil to another place, with the intention of remaining there for an indefinite time, and as a place of fixed present abode, the latter place is regarded as his domicil of choice," and this is true regardless of whether the person in question "`may entertain a floating intention to return at some future period.'" 76 Ala. at 438.
The record in this case reveals that Hawkins lived for much of her life in a residence in Etowah County. In January 2003, because of the effects of senile dementia, she entered a nursing home, Saint Martin's in the Pines ("St. Martin's"), in Jefferson County, bringing with her her clothes, grooming implements, pictures, religious materials, bedclothes, favorite personal items (such as clown figurines), a television set, various compact discs, and a personal stereo system. According to Scroggins, Hawkins, who was of the Episcopalian faith, had indicated that if she could no longer live in her residence, she would want to go to St. Martin's, where her Episcopal minister was. Scroggins testified that when Hawkins had moved into the nursing home, she moved there "to stay," and that her home in Etowah County, which she had occupied since approximately 1940, was offered for sale on the open market; Scroggins added that certain items of furniture from Hawkins's Etowah County home were later sold with Barron's permission. According to Scroggins, Hawkins's dementia had been severe enough to require around-the-clock supervision — Hawkins had apparently set her dress on fire on three separate occasions.
Barron testified that he had made the arrangements to cause Hawkins's admission to St. Martin's, that he had consented to her staying at that nursing home out of concern for her well-being and because Scroggins resided in Jefferson County, and that he had placed a "For Sale" sign in front of Hawkins's Etowah County residence without objection from her in an effort to secure cash to help take care of her. Barron also testified that family members had taken things from the Etowah County residence after Hawkins had moved to St. Martin's, and he admitted that he had no evidence, apart from his recollection of Hawkins's desires, that Hawkins intended to return to Etowah County.
It is apparently true that Hawkins expressed a "floating intention" (in the words of Morrissett) to return home to Etowah County in that Scroggins admitted that during the first few weeks of Hawkins's residency at St. Martin's, Hawkins had asked Scroggins on occasion when Barron was "coming to get" her (Hawkins). However, it appears that the probate court gave greater weight to the evidence tending to show that Hawkins's family members, including both parties to this appeal, were in agreement that there was no feasible way for Hawkins to remain in her home in Etowah County without supervision and that no caregiver *Page 784 
could be located to stay with her in that residence; thus, Barron, who held a durable power of attorney, secured Hawkins's admission to St. Martin's and paid for her continued stay there until her final hospitalization and death. Indeed, the residence itself was placed on the market for sale by Barron, a fact that the probate court described as "most significant" in ascertaining Hawkins's intent to become an inhabitant of Jefferson County. We thus conclude that the probate court's determination that Hawkins had established a domicile in Jefferson County at the time of her death was not clearly erroneous or manifestly unjust so as to warrant reversal.
The second issue raised by Barron principally concerns the ownership of a particular bank account, although other determinations of the probate court based upon its resolution of that issue are also challenged. At the ore tenus proceeding, the probate court admitted an exhibit into evidence that purported to be two photocopied signature cards with respect to a particular bank account. The first of those signature cards was dated July 1, 1991, and bore the names of both Hawkins and her husband as signatories on the account (which was on deposit at the First Alabama Bank of Rainbow City). That card bore the account title "Marian E or Fred W Hawkins" and the notation "Joint with Survivor." The second signature card, dated May 19, 2001, and pertaining to the same account number at Regions Bank (which is the apparent corporate successor to First Alabama Bank of Rainbow City), bears the names and signatures of Hawkins and Barron. However, while the account is listed as being in the names "Marian E Hawkins or Jeff K Barron," the "Title Type" is listed as "JOF — Joint or First." Thus, while the pertinent bank account had been the sole possession of Hawkins after the death of her husband, with whom she had held the account as a joint tenant with right of survivorship, the particular signature card bearing Barron's name after the linking word "or" after Hawkins's name did not likewise bear the legend "Joint With Survivor."
We agree with Barron that the ownership of the account is to be determined by reference to Ala. Code 1975, § 35-4-7. That statute provides that, as a general rule, when a joint tenant dies before any severance of the tenancy, that tenant's interest "does not survive to the other tenants but descends and vests as if his interest had been severed and ascertained." However, § 35-4-7
contains a proviso under which the general rule will not apply, and a deceased tenant's interest will pass to the surviving joint tenants, "in the event it is stated in the instrument creating such tenancy that such tenancy is with right of survivorship or other words used therein showing such intention." Under § 35-4-7, as the Supreme Court noted in Andrews v. Troy Bank Trust Co.,529 So.2d 987 (Ala. 1988), "`a grant of personal property . . . to two or more persons creates in them a tenancy in common with respect to such property unless the proviso [in § 35-4-7] . . . is complied with; that is, the instrument creating the estate must clearly indicate that a joint tenancy with right of survivorship was intended,'" or, stated another way, "`an instrument creating a joint tenancy with right of survivorship must clearly express the incident of survivorship if such was intended by the parties.'" 529 So.2d at 993 (emphasis added; quoting Parr v. Godwin, 463 So.2d 129, 134-35 (Ala. 1984) (Torbert, C.J., dissenting)).
The May 19, 2001, signature card, which lists Hawkins and Barron as signatories on the pertinent bank account and which contains the designation "Joint," *Page 785 
may properly be deemed to be evidence of a joint tenancy in that account. However, as the probate court determined, that signature card (unlike the signature card executed by Hawkins and her husband in 1991) does not clearly express any intent that Barron receive the proceeds upon the death of Hawkins; instead of expressly referring to a right of survivorship or expressly containing a direction that the funds be payable to one signatory upon the death of the other, the account bears the added designation "or First." Rather than guessing as to whether "or First" indicated that the proceeds were intended by Hawkins to vest in the first survivor (Barron), the first decedent (Hawkins), or the first party listed on the card (Hawkins), the probate court simply stated that the account was not on its face a survivorship account, a determination consistent with Andrews,supra. In any event, the signature card was certainly not, as Barron contends, clear and complete on its face to the effect that he would become the sole owner of the bank account upon Hawkins's death.
Barron's conduct with respect to the joint bank account clearly prompted the probate court's decision to declare Barron disqualified to act as executor. The probate court determined that Barron had been named as Hawkins's agent in an instrument conferring a durable power of attorney upon Barron as to Hawkins's affairs during her lifetime, and it ruled that Barron had owed a fiduciary duty to Hawkins and had been charged with the protection of her assets during her lifetime; the probate court further determined that Barron had admitted that he had been added as a signatory to Hawkins's bank account for her convenience rather than in an effort to confer a gift upon Barron. Based upon those determinations, as well as its finding that Barron had withdrawn $54,000 from the bank account for his personal use, the probate court concluded that Barron had engaged in self-dealing and had breached fiduciary duties he owed to Hawkins.
The record contains substantial evidence to support the probate court's determinations. In a document dated May 13, 2001, six days before the execution of the signature card naming Barron as a signatory on Hawkins's bank account, Hawkins conferred upon Barron a durable power of attorney in which Barron was allowed to act on her behalf "for any of [her] affairs" if Hawkins became "physically or mentally unable to make decisions."[1]
Barron testified that Hawkins had added his name to her bank account without his having been present and that he had been asked to visit the bank later to add his signature to the signature card. He further testified that Hawkins had placed his name on the account "to handle her affairs in the event she couldn't handle them herself." However, Barron admitted that he had written checks withdrawing funds from the bank account during Hawkins's lifetime and on the date of her death, funds that he either could not remember having spent on Hawkins's needs or that he remembered having spent upon himself or his wife. One of those withdrawals, in the amount of $10,000, was reputedly made to discharge a preexisting indebtedness of Hawkins to Barron, although no evidence was submitted to corroborate Barron's testimony in that regard. As to his withdrawals, Barron tellingly admitted, "I don't guess there's any convenience to my grandmother [Hawkins] there at all."[2] Further, Barron *Page 786 
admitted having withdrawn approximately $37,000 in cash from the account during the weeks immediately following the death of Hawkins, bringing the amount of Barron's total withdrawals from the account to just over $54,000.
We conclude that Barron's challenge to the probate court's determinations regarding the ownership of the pertinent bank account, as well as regarding the culpability of Barron's conduct in light of those determinations, is not well grounded. The record contains substantial evidence indicating that although Barron was made a signatory on Hawkins's account for her convenience, and that although the signature card listing him as an account holder did not clearly identify him as having a survivorship interest, Barron withdrew thousands of dollars from the account for his own benefit. Not only could the probate court properly conclude that that conduct contravened the intent of Hawkins in adding Barron as a signatory to the specific bank account, but that court could also have ruled, as it did, that that conduct also constituted a breach of Barron's fiduciary duties owed to Hawkins arising from his agency relationship. SeeLamb v. Scott, 643 So.2d 972, 974 (Ala. 1994) ("One who accepts a power of attorney covenants to use the power for the sole benefit of the one conferring the power and to use it in a manner consistent with the purposes of the agency relationship created by the power of attorney."), and Sevigny v. New South Fed. Sav. Loan Ass'n, 586 So.2d 884, 887 (Ala. 1991) ("The principal-agency relationship is fiduciary in nature and imposes upon the agent a duty of loyalty, good faith, and fair dealing.").
Barron has also raised a third issue: whether the probate court properly appointed the Jefferson County general administrator as the personal representative of the estate. However, Barron's argument as to that issue merely reiterates his contentions that the probate court erred as to venue, the ownership of the bank account, and the culpability of Barron's conduct, and it is not the function of the appellate courts to create arguments for an appellant. See McLemore v. Fleming, 604 So.2d 353 (Ala. 1992). Because we have already concluded that Barron's arguments as to his predicate issues are without merit, we do not separately address whether the general administrator was properly appointed as the personal representative of Hawkins's estate by the probate court.[3]
Based upon the foregoing facts and authorities, the judgment of the probate court is due to be affirmed.
AFFIRMED.
CRAWLEY, P.J., and THOMPSON and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.
[1] That power-of-attorney document was recorded in the Etowah Probate Court in December 2002, immediately before Hawkins went to St. Martin's.
[2] While Barron contends that his deposition testimony should be considered in conjunction with this statement, the transcript of the deposition was not admitted into evidence and does not appear in the record; thus, we may not consider the purported recitation of that testimony appearing in his appellate brief.E.g., Roberts v. Roberts, 424 So.2d 644, 645 (Ala.Civ.App. 1982) (record cannot be enlarged by statements appearing in briefs of counsel).
[3] We note that although the probate court's appointment of the general administrator might also have prejudiced Scroggins's rights to serve as personal representative of the decedent's estate because Scroggins, like Barron, was named as a co-executor in Hawkins's will, Scroggins did not cross-appeal as to that issue. *Page 787