WISE, Justice.
Mark Robert Engel and Daniel Michael Engel appeal from the Mobile Probate Court's order disqualifying them as co-executors of their mother's estate and appointing a third party to administer the estate. We affirm.
Facts and Procedural History
On November 23, 2015, Rositha Lorsch Engel[1] died. In her will, she named Mark Robert Engel and Daniel Michael Engel as co-executors. On March 9, 2016, Mark and Daniel filed a petition for letters testamentary in the Mobile Probate Court. The petition listed Rositha's heirs as her four children: Marion Thomas Whitman ("Thomas"), Mark Robert Engel, Daniel Michael Engel, and Bonita Engel Amonett.
On May 5, 2016, Bonita and Thomas filed an objection to the appointment of Mark and Daniel as co-executors of their mother's estate, arguing that Mark and Daniel were disqualified from serving as co-executors for the reasons stated in § 43-2-22, Ala. Code 1975. Specifically, they contended that Mark and Daniel, either directly or by agent, had been selling Rositha's personal property, as well as personal property of other individuals located in Rositha's residence, by way of the Internet without having the authority to do so. Bonita and Thomas asserted that such actions reflected "intemperance, improvidence, or want of understanding" such that Mark and Daniel were disqualified from serving as the co-executors of Rositha's estate, and they asked that the Mobile County general administrator or some other neutral party be appointed to administer the estate. They also requested that Mark and Daniel be enjoined from selling any of Rositha's personal property and that they be required to account for, and turn over the proceeds from, any items that had already been sold.
The probate court conducted a hearing on May 9, 2016. On May 13, 2016, it entered an order in which, with the consent of all parties, it enjoined all parties from "disposing [of], transferring, giving away, spending, or otherwise dissipating" property belonging to the estate.
The probate court conducted a pretrial conference on July 11, 2016. Thereafter, on July 21, 2016, it entered an order in which it stated that it would conduct a hearing on October 13, 2016, and that the triable issues for that hearing were:
"A. Whether or not Mark Robert Engel and Daniel Michael Engel should be appointed as co-executors as stated in the Last Will and Testament of Rositha L. Engel dated April 15, 2008;
"B. Whether or not Mark Robert Engel and Daniel Michael Engel sold personal property of decedent and committed waste of estate assets or diverted any estate assets;
"C. If Mark Robert Engel and Daniel Michael Engel sold personal property *533 and committed waste of assets, what is the value of the personal property sold and should they return the value to the estate; and
"D. Whether or not the Court should appoint the Mobile County General Administrator to administer decedent's estate."
The probate court conducted the hearing on the petition on October 13, 2016. Afterward, on October 17, 2016, it entered an order in which it stated:
"This cause came before the Court on October 13, 2016, on the Petition for Letters Testamentary filed by Mark Robert Engel and Daniel Michael Engel and the Objection to Appointment of Personal Representative and Motion to Appoint General Administrator or Other Neutral Representative filed by Bonita Engel Amonett and Marion Thomas [Whitman]. Appearances were noted in the record. This cause is properly before the Court pursuant to its jurisdiction and authority as conferred by statute, local act and Constitutional provisions. Upon consideration of the evidence and argument presented, the Court FINDS, CONCLUDES AND ORDERS as follows:
"1. The Petition for Letters Testamentary is DENIED IN PART. The proffered will is admitted to probate; however, the Objection to Appointment of Personal Representative and Motion to Appoint General Administrator or Other Neutral Representative is SUSTAINED and GRANTED.
"2. Frank H. Kruse, General Administrator of Mobile County Probate Court shall be appointed Personal Representative of the Estate and Letters of Administration with the Will Annexed shall issue forthwith.
"3. Mark Robert Engel and Daniel Michael Engel are ORDERED to provide an accounting to the Personal Representative of any personal property sold or put up for sale since the date of decedent's death.
"4. Mark Robert Engel and Daniel Michael Engel are ORDERED to turn over to the Personal Representative any assets in their possession belonging to the Estate.
"5. The Personal Representative is ORDERED to file an inventory on or before November 18, 2016."
(Capitalization in original; emphasis added.)
On November 4, 2016, Mark and Daniel filed a notice of appeal to this Court.
Standard of Review
" 'Because the probate court's judgment is based, in part, upon testimony adduced at an ore tenus proceeding, we presume its judgment to be correct, and we will not reverse its judgment unless it is "palpably erroneous." Cox v. Logan, 262 Ala. 11, 13, 76 So.2d 169, 171 (1954). A more recent statement of the "ore tenus" rule, as applicable in an appeal from a probate court's judgment, appears in Craig v. Perry, 565 So.2d 171, 175 (Ala. 1990) (citations omitted):
" ' "[W]hen a court hears ore tenus evidence in a nonjury case, its ruling based on that evidence is presumed correct and will be overturned only if clearly erroneous or manifestly unjust. ... The presumption of correctness is especially applicable where ... the evidence was conflicting. The weight to be given the witnesses' testimony [is] for the trial judge, because he had the opportunity to view the witnesses and their demeanor." '
" Barron v. Scroggins, 910 So.2d 780, 782-83 (Ala. Civ. App. 2005)."
McGallagher v. Estate of DeGeer, 934 So. 2d 391, 401 (Ala. Civ. App. 2005).
*534 Discussion
Mark and Daniel argue that the probate court erred in disqualifying them from being the co-executors of their mother's estate. Specifically, they contend that the probate court stated that it was disqualifying them because the heirs, which included them, did not get along and for "efficiency of administration," which they assert are not proper grounds for disqualifying them from serving as co-executors. Therefore, Mark and Daniel conclude, the probate court's order should be reversed and they should be appointed as the co-executors of their mother's estate.
Bonita and Thomas argue that the probate court's order was "grounded in the reasons enumerated by Ala. Code [1975,] § 43-2-22(a)," and that that court did not err in finding that Mark and Daniel were disqualified from serving as co-executors for the reasons stated in § 43-2-22. Section 43-2-22(a) provides, in relevant part:
"No person must be deemed a fit person to serve as executor who is under the age of 19 years, or who has been convicted of an infamous crime, or who, from intemperance, improvidence or want of understanding, is incompetent to discharge the duties of the trust."
Bonita and Thomas contend that Mark's and Daniel's "entire appeal is predicated on the assumption that the Probate Court's Final Order was solely based on 'efficiency of administration' " and that "[t]he basis for this wrongful assumption are two gratuitous sentences that were uttered by the judge at the close of the trial prior to entering the final order." Instead, they assert that
"the [probate court] made no indication in [its] verbal statements that this was the sole reason for [its] decision. The Final Order itself, read in light of the pleadings and, in particular, the Objection, clearly reflects that the basis of the [court's] decision was the finding that Mark's and Daniel's conduct (including but not limited to their efforts to sell the Decedent's personal property) reflected intemperance, improvidence, and/or want of understanding, which disqualified them from serving as co-executors of the Decedent's Estate."
We agree with Bonita and Thomas. In their objection to the appointment of Mark and Daniel as co-executors, Bonita and Thomas argued that Mark and Daniel were disqualified from serving as co-executors for the reasons stated in § 43-2-22 because they and/or their children had been placing Rositha's personal property for sale on various sites on the Internet. Also, the probate court entered an order enjoining all parties from "disposing [of], transferring, giving away, spending, or otherwise dissipating" property belonging to the estate. Finally, the probate court entered an order in which it stated that the issues to be tried at the hearing were 1) whether Mark and Daniel sold Rositha's personal property and committed waste of estate assets or diverted any estate assets, and, if so, 2) what was the value of the personal property sold and should the value be returned to the estate, and 3) whether the court should appoint the general administrator to administer the estate. Clearly, the issue about which the probate court was concerned was whether Mark and Daniel were disqualified from serving as co-executors for the reasons stated in § 43-2-22.
Also, the evidence presented during the hearing focused on the question of Mark's and Daniel's fitness to serve based on whether they should be disqualified pursuant to § 43-2-22. During the hearing, Bonita testified that Daniel, his wife, and his three children lived with their mother for at least eight years during which time Daniel did not work and that Daniel did *535 not pay their mother rent or pay for utilities during the time his family lived with her. She explained that Daniel had previously owned a contracting business but that the business had suffered when the economy took a downturn. Bonita stated that, eventually, her mother had put a deadbolt lock on the door to her bedroom because she felt like some of her things, including coins, were missing and that Daniel or his children might have taken them.
Bonita testified that, after her mother died, some items of her mother's personal property were placed for sale on various Internet sites. She stated that she e-mailed Mark and told him that Daniel and his daughter were putting their mother's personal property up for sale on various Internet sites. Bonita testified that Mark had indicated that he would say something to Daniel but that the sale of her mother's personal property still continued. She also testified that, at some point, Mark blocked her texts and e-mails.
Bonita testified that she and her children had visited with her mother frequently before her death and that they all had items of personal property in her mother's house. She also testified that, when she tried to enter and retrieve some of those items after her mother died, Daniel refused to let her in and called law-enforcement authorities.
Bonita testified that she and Mark had talked about their mother's estate and that, at a Christmas gathering, Mark had expressed concern about Daniel's serving as the executor. In particular, she explained that her father's estate, the Mylan Engel estate, was still open nine years after his death because it involved a great deal of land; that some of the farmland is leased and the checks on the leased land had been being made out to her father's estate; and that, after her mother died, one of those rent checks had been made out to Daniel instead of to her father's estate. Bonita also stated that Mark was concerned that Daniel was "pocketing" the money paid for the lease of the farmland.
Bonita testified that, a few days before her mother's death, Mark and Daniel decided to put their mother's house in Mark's name, for the benefit of the siblings, and that she agreed to it. She explained that they did so in an attempt to protect Daniel's share of their mother's estate from his business creditors.
Bonita testified that Mark and Daniel were identical twins; that, because of that, they had a "bond"; and that Mark had concerns about Daniel's handling their mother's estate. She stated that Daniel had built a house for Mark and that he repeatedly complained that Mark had never paid him. However, Mark showed her a copy of the check he had given David and explained that he had put money in Daniel's account and that Daniel's creditors had gotten the money, so he had then given the money for the house to their mother for Daniel's benefit.
Thomas testified that he lived with his mother in her house until she died. After she died, he said, Mark and Daniel made things so difficult for him that he moved out. Specifically, Thomas testified that they blocked the driveway to keep him from coming and going; that Daniel said that he and Mark were going to throw Thomas out of the house; that they said that it was their house and that they were the executors of their mother's will and they could legally do what they wanted; that they did many loads of laundry near his room during the evenings when he was home; and that Daniel broke some of their mother's furniture after he complained about their doing the laundry there. He also testified that Daniel allowed his own children to drive their mother's car after *536 she died, even though she never would have let them drive it if she were alive.
Thomas testified that Lehman Farms had a lease arrangement with Mylan Engel's estate, the proceeds of which basically paid the taxes on the land. He also testified that, shortly after their mother's death, he saw a check from Lehman Farms that was made out to Daniel personally instead of to Mylan Engel's estate. He further testified that he had made Mark aware that Daniel had received a check and that Mark had indicated that he would look into it.
Thomas testified that, during the Christmas gathering, Mark had expressed concern about Daniel's fitness to serve as an executor of their mother's estate. He also testified that Bonita had made him aware that items of their mother's personal property were being placed for sale on various Internet sites. Finally, he stated that his mother had wanted all of her clothing and personal items that were in her bedroom to go to Bonita, but that Mark and Daniel were not going to let that happen.
Thomas testified that he agreed with Bonita's objection to Mark's and Daniel's serving as co-executors of their mother's estate. He also testified that he always knew that Daniel was "shady" and "underhanded" and that he would "lie[ ], steal[ ], [and] cheat[ ]." However, he stated that he "didn't see it coming with Mark."
Mark testified that he had notified various entities that their mother had died, that he had filed her tax returns, and that he had kept a diary of transactions regarding the estate that had occurred since her death. He also testified that Bonita had used one of their mother's credit cards after their mother died and that he had told her not to use it again. Finally, he testified that he personally paid the premiums for the insurance on his mother's vehicle after she died to keep it insured.
Mark testified that, at the time of the hearing, Daniel and his children were still living in their mother's house. He also testified that Bonita's children often stayed there, that one of them lived there for many years, and that their mother paid for food, living expenses, and tuition for that child. Finally, he testified that Thomas lived in their mother's house and did not pay for anything.
Mark testified that he knew that his mother had gotten a deadbolt lock for her bedroom door because she felt like people were going in there and taking things. He stated that there was a competition between Daniel and Bonita and their children and that, in his opinion, their mother had been brainwashed to think that Bonita's children could do no wrong and that Daniel's children could do no right. Mark admitted that, shortly before she died, their mother asked him to get her furs and jewelry and give them to Bonita because she was concerned about those items being in the house when she was no longer there.
Mark testified that, shortly before their mother died, he used a power of attorney she had given him to put the title to her house in his name because of concerns the children had about Daniel's creditors. Although he agreed that the house belonged to all four children, he acknowledged that Daniel was still living in the house and that there had not been any discussion about his paying rent to the estate, but he stated that their mother would not want Daniel to pay rent. When he was asked how long Daniel would be allowed to live in the house rent free, Mark stated: "Well, once this gets resolved, then we'll distribute it. We'll get rid of everything. I can't do anything while my hands are tied."
Mark testified that there had been an altercation at the house between Bonita and Daniel, that items were being taken *537 out of the house, and that he went to the house to try to keep the peace. He also testified that he did not know anything about their mother giving certain items to certain children before she died and that he would contend that all such items needed to be returned and distributed according to the terms of their mother's will. However, Mark later admitted that he took his mother's bedroom furniture after she died because she had previously told him that she wanted him to have it.
With regard to the lease arrangement with Lehman Farms, Mark testified that a check for rent had been made out to Daniel following their mother's death. However, he explained that the land that was being leased had been split between the four children and that the rent had been paid to his mother, who in turn had paid the taxes for the parcels that belonged to Daniel, Thomas, and Bonita. He also explained that Daniel handled everything with regard to the land in their father's estate and that he assumed that Daniel talked with a representative of Lehman Farms about the rent check after their mother died. When asked if Daniel told the representative to make the check payable to him alone, Mark said: "I guess. I mean, you have to ask him that. I can't answer that." Mark further stated that his initial concerns about Daniel's being a co-executor of their mother's estate were erased once Daniel clarified why he had received a rent check from Lehman Farms.
On cross-examination, Mark admitted that, although he had not thought about it, at least a portion of the rent paid by Lehman Farms may have been an asset of their mother's estate. He stated that he had not notified Lehman Farms about their mother's death and that he assumed that Daniel had instructed Lehman Farms to make out the rent checks to him.
Mark was asked about Bonita's informing him that items that belonged to their mother were being offered for sale on the Internet. The following then occurred:
"A. Bonita sent me a notice saying things were being listed. I had no knowledge. I immediately e-mailed Daniel and said, 'If this is going on, it better stop.' But I don't live there. I don't come and go there. So I, you know-I'm being-You're asking me to be responsible for behavior that I can't be responsible for.
"Q. And I'll accept that you made that communication, but Daniel didn't stop; did he?
"A. I don't know.
"Q. Well, if the time that we first came down here in either May or June and we got the status quo order-
"A. Uh-huh.
"Q.-things were still being listed on the Internet then; weren't they?
"A. I don't know. I don't do social media and all that stuff. I just opened a Facebook [social-media] page for the first time, so I can't really-
"Q. Mark, you weren't concerned enough about that problem that you monitored to see (inaudible)-
"A. I told him.
"Q.-your brother?
"A. I told him repeatedly if that's going on to stop.
"Q. But you didn't-
"A. Now, what he does with it-
"Q. You didn't follow through to make sure he stopped?
"A. Well, I mean, how do you want me to make him stop. If someone's doing something, I can't make them-I can't control people's behaviors. All I can do is notify them; tell them to stop, which I did. I e-mailed him and told him and told him if it's going on, it needs to stop. If *538 you sold anything, you need to retrieve it. I specifically told him that.
"And the reason I blocked them is because they wouldn't stop harassing me. I-you know, at some point I have to make a living. I can't be-I can't, all day long, be bombarded with them-with stupid questions. I can't handle that."
Mark testified that he believed that he could carry out his duty as the executor of the estate. He also testified that their mother had said that she wanted him and Daniel to be the executors of her estate because she was afraid that Bonita "would spend everything on purses and clothing and jewelry and stuff like that." However, he admitted that he had declared bankruptcy approximately 20 years before. Finally, Mark stated that his parents' estates were intertwined and that he believed appointing another person to handle their mother's estate would unnecessarily add expense and time to the administration of her estate.
Daniel testified he and Bonita and Thomas had had some issues during the seven or eight years that he and his children lived in their mother's house. He also testified that their mother had invited them to move in after he lost his business and that, while he was there, he remodeled the house. Daniel further testified that, when he was living there after the first time he separated from his wife, he paid their mother $1,200 per month and he paid all the household bills. He added that Thomas never contributed anything to the house or expenses.
Daniel admitted that his daughter Hannah had placed some items of their mother's personal property for sale on the Internet. However, he testified that they had not been sold and that the items were at the house. Daniel stated that he himself had not placed any items of their mother's personal property for sale. He also stated that, even though the items indicated that they had been placed for sale on the Internet by Daniel Engel, he was not the person who had placed them for sale.
Daniel testified that there were approximately 13 parcels of real estate in his father's estate and that, before he died, his father had also designated parcels for each of the children and for their mother. He also testified that Lehman Farms leased property from his father's estate as well as parcels that belonged to the children and their mother and that all the rent was paid to their mother until she died. Daniel stated that, after their mother died, he learned about the land and the arrangement with Lehman Farms. He also stated that Lehman Farms took it upon itself to write the rent check to him after their mother died.
Daniel testified that their mother had been sole executor of their father's estate before she died and that he had helped her handle it. He also testified that he and Mark were now the co-executors of their father's estate and that one-third of the acreage in their father's estate would go to their mother's estate. Finally, he testified that he was asking that he and Mark be allowed to serve as the co-executors of their mother's estate because appointing a third party would cost additional money and consume more time.
At the end of the hearing, the probate court stated:
"It seems to me, clear, that-and it's unfortunate that we see it in this court all the time, that the siblings cannot get along. And the estate administration will be more efficient with a neutral third party. And with any luck, maybe over time, the sibling relationships will be repaired. I certainly hope that. And I am pleased to hear that you all, at least, sound open to that.
*539 "So my inclination is to appoint Frank Kruse because he's the County General Administrator."
Thereafter, the probate court entered a written order in which it stated, in relevant part:
"This cause came before the Court on October 13, 2016, on the Petition for Letters Testamentary filed by Mark Robert Engel and Daniel Michael Engel and the Objection to Appointment of Personal Representative and Motion to Appoint General Administrator or Other Neutral Representative filed by Bonita Engel Amonett and Marion Thomas [Whitman]. Appearances were noted in the record. This cause is properly before the Court pursuant to its jurisdiction and authority as conferred by statute, local act and Constitutional provisions. Upon consideration of the evidence and argument presented, the Court FINDS, CONCLUDES AND ORDERS as follows:
"1. The Petition for Letters Testamentary is DENIED IN PART. The proffered will is admitted to probate; however, the Objection to Appointment of Personal Representative and Motion to Appoint General Administrator or Other Neutral Representative is SUSTAINED and GRANTED.
"2. Frank H. Kruse, General Administrator of Mobile County Probate Court shall be appointed Personal Representative of the Estate and Letters of Administration with the Will Annexed shall issue forthwith.
"3. Mark Robert Engel and Daniel Michael Engel are ORDERED to provide an accounting to the Personal Representative of any personal property sold or put up for sale since the date of decedent's death.
"4. Mark Robert Engel and Daniel Michael Engel are ORDERED to turn over to the Personal Representative any assets in their possession belonging to the Estate.
"5. The Personal Representative is ORDERED to file an inventory on or before November 18, 2016."
(Capitalization in original; emphasis added.)
After reviewing the orders entered before the hearing and the language in the final order, we cannot conclude that the probate court found that Mark and Daniel were disqualified simply on the basis of "efficiency of administration." Rather, it is clear to this Court that the probate court found that Mark and Daniel were disqualified for reasons of improvidence or want of understanding, as set forth in § 43-2-22.
Further, the evidence supports the probate court's order.
" 'Improvidence means a lack of care and foresight, of forehandedness, of thrift, of business capacity. It does not mean, however, that the capacity for care and foresight must needs to be proved by the accumulation of any considerable estate, for men are largely creatures of time and chance. Improvidence in this connection means only that probable lack of care and foresight in the management of the estate's only asset which would endanger its safety in case administration should be committed to appellee.'
" Nichols v. Smith, 186 Ala. 587, 591-92, 65 So. 30, 31 (1914)."
Thames v. Thames, 183 So.3d 168, 180 (Ala. Civ. App. 2015).
"Improvidence as here used has been defined as that probable lack of care and foresight in the management of the estate which would endanger its safety in case administration should be committed to the applicant. Nichols v. Smith, 186 Ala. [587,] 592, 65 So. 30 [ (1914) ] ; 33 *540 C.J.S., Executors and Administrators, p. 947, § 46, subsec. e; In re Ferguson's Will, 41 Misc. 465, 84 N.Y.S. 1102 [ (N.Y. Sur. 1903) ].
"The disqualifying term means more than the lack of capacity to accumulate a considerable estate ( Nichols v. Smith, supra, 186 Ala. at page 591, 65 So. 30 ) ....
"A much quoted New York decision observed that improvidence, as termed in the statute, 'refers to habits of mind and conduct which become a part of the man, and render him generally, and under all ordinary circumstances, unfit for the trust or employment in question.' In Matter of Flood's Will, 236 N.Y. 408, 411, 140 N.E. 936, 937 [ (N.Y. 1923) ], quoting Emerson v. Bowers, 14 N.Y. 449 [ (N.Y. 1856) ]. See also In re Schwartz' Estate, 138 Misc. 537, 246 N.Y.S. 478, 480 [ (N.Y. Sur. 1930) ]."
Griffin v. Irwin, 246 Ala. 631, 635, 21 So.2d 668, 671 (1945).
" 'Improvidence' is thus defined in 42 C.J.S., p. 472:
" 'In general, a lack of business capacity, care and foresight, forehandedness, prudence, or thrift; and, more specifically, a want of care and foresight in the management of property. The term refers to habits of mind and conduct which become a part of the man and render him generally and under all ordinary circumstances unfit for the trust or employment in question; but does not necessarily imply a failure to accumulate any considerable estate.'
"Webster's New International Dictionary, 2d Ed., defines 'improvidence' as 'want of foresight or thrift.' "
Smith v. Rice, 265 Ala. 236, 248, 90 So.2d 262, 273 (1956).
During the hearing, Bonita and Thomas presented evidence indicating that Daniel had had difficulties with his own financial affairs; that their mother had provided financial support for Daniel and his family; that their mother had put a deadbolt lock on her bedroom door because she felt like some of her things, including coins, were missing and that Daniel or his children might have taken them; and that, after their mother died, at the very least, Daniel's daughter had placed items of their mother's personal property for sale on various sites on the Internet. They also presented evidence indicating that Bonita had notified Mark about the items that had been placed for sale on the Internet; that he had indicated that he would say something to Daniel but that it continued; and that, at some point, Mark blocked her texts and e-mails. Further, Bonita testified that a rent check from Lehman Farms had been made out to Daniel personally and that Mark had, at one time, expressed concerns about Daniel's "pocketing" the money.
During his testimony, Mark appeared to show a lack of appropriate concern about Daniel and his actions with regard to the Lehman Farms rent checks, to not paying rent for the time he lived in their mother's house, and to the possible sale of their mother's property on the Internet. Specifically, he appeared to take Daniel's representations as true, to not follow up on questions about Daniel's actions, to not make sure that personal property was not being sold, and to act as if his hands were somehow tied. Mark also offered what appeared to be inconsistent testimony about whether his mother had given property to her children before her death. At one point, he stated that he did not know about any such gifts, but he later stated that he had taken a bedroom suite she had stated she wanted him to have.
In light of the evidence presented, the probate court could have reasonably *541 concluded that there were questions as to Mark's and Daniel's willingness, ability, and fitness to do what was best for the estate. Specifically, it could have concluded that Daniel's actions before their mother died and both Daniel's and Mark's actions after their mother died demonstrated improvidence and a want of understanding such that they were disqualified from serving as the co-executors for her estate.
"Our ore tenus standard of review is well settled. ' "When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error." ' Smith v. Muchia, 854 So.2d 85, 92 (Ala. 2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala. 1996) ).
" 'The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.' Hall v. Mazzone, 486 So.2d 408, 410 (Ala. 1986). The rule applies to "disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala. 1995). The ore tenus standard of review, succinctly stated, is as follows:
" ' "[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence." '
" Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala. 1977) )."
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala. 2010).
For the above-stated reasons, the probate court could have reasonably concluded that Mark and Daniel were disqualified from serving as the co-executors of their mother's estate pursuant to § 43-2-22. Accordingly, we affirm the probate court's judgment.
AFFIRMED.
Stuart, C.J., and Shaw, Main, and Sellers, JJ., concur.

The decedent's name is also spelled "Roswitha" in the record.