Rel: March 7, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0680

_____

## Jessica Leigh Coleman

## v.

## Travis Rayford Coleman

## Appeal from Monroe Circuit Court
## (DR-20-900084)

MOORE, Presiding Judge.

Jessica Leigh Coleman ("the wife") appeals from a judgment entered by the Monroe Circuit Court ("the trial court") divorcing her from Travis Rayford Coleman ("the husband"). We affirm the judgment in part

and reverse the judgment in part, and we remand the case with instructions.

Procedural History

On December 9, 2020, the husband filed in the trial court a complaint for a divorce against the wife; he requested, among other things, an equitable division of the parties' assets and an award of attorney's fees. On December 11, 2020, the trial court entered a pendente lite order directing the parties to, among other things, preserve, in their present form and location, all assets owned by them either jointly or individually. The wife filed an answer to the complaint and also counterclaimed for a divorce; she asserted that the husband had committed adultery during the marriage, and she sought, among other things, an award of alimony, a division of the parties' assets and debts, and an award of attorney's fees. On August 31, 2021, the wife filed a motion for contempt; she asserted that the husband had failed to abide by the pendente lite order by disposing of and diminishing the parties' assets.

On June 28, 2023, a trial was conducted. On August 5, 2023, the trial court entered an order divorcing the parties, dividing the parties'

2

assets, and declining to award alimony to the wife. On September 5, 2023, the wife filed a motion to alter, amend, or vacate the August 5, 2023, order; on December 7, 2023, the trial court entered an order denying the wife's motion. On January 8, 2024, the wife filed a notice of appeal to this court; that appeal was docketed as appeal number CL-2024-0020. On February 22, 2024, this court entered an order dismissing that appeal as having been taken from a nonfinal judgment, based on the trial court's failure to adjudicate the wife's August 31, 2021, motion for contempt. On March 11, 2024, this court issued its certificate of judgment in appeal number CL-2024-0020. On June 18, 2024, the trial court entered an order denying the wife's motion for contempt. On July 17, 2024, the wife filed a postjudgment motion, which the trial court denied on August 12, 2024. On August 27, 2024, the wife filed a notice of appeal to this court. This court entered an order incorporating the record from appeal number CL-2024-0020 into the present appeal.

## Facts

The husband and the wife married on September 14, 1995. The husband, who was 49 years old at the time of the trial, testified that, when the parties married, the wife had a son, Hunter, from a previous

relationship and that the parties had had two daughters during their marriage. All three children had reached the age of majority at the time of the trial. The husband testified that, at the time he commenced the divorce action, the parties owned a home in Excel ("the marital residence"). According to the husband, he had formed an auto-body-shop business, Airport Collision, in 2005, which, he said, he and the wife had owned together and for which he had run the day-to-day operations; that business was sold in 2018 for approximately $800,000. He stated that he had used $500,000 of the sales proceeds to pay off some tax liens owed on a different business, Swish, a boutique that had been run by the wife, and to pay off other debt, including the debt on the marital residence and the vehicles that the parties had owned at that time. The remaining $300,000 from the sale was to be paid in monthly installments in the amount of $2,500; the husband stated that he had used the money that he had received from those payments "as needed for all the bills" and that, at the time of the trial, of that $300,000 there remained $140,000 owing. He stated that, two months after selling Airport Collision, he had used some of the money from the sale of that business to open another business, Auto Spa Express, which, he said, he owned with the wife.

4

The husband testified that, in September 2020, he had started another business, Monroe Auto Glass, which, he said, was an LLC in which he owned a one-half interest along with Todd Johnson. According to the husband, the building out of which Monroe Auto Glass operates had appraised for less than $215,000, which, he said, was the amount of debt that was associated with that business at the time of the trial. He stated that the income that he receives from Monroe Auto Glass varies depending on the amount of work performed by the business, but that he draws an average income of $30,000 to $35,000 per year from that business. The husband testified that, at the time he commenced the divorce action, the parties had had approximately $190,000 in bank accounts. Both parties testified that the husband had paid the parties' bills during the marriage.

When asked why he wanted a divorce, the husband responded that the parties were no longer compatible; he stated that he and the wife had "struggled for years" and that the wife had paid attention to her cellular telephone instead of the husband. The wife stated that she had been on her cellular telephone running her business and that the husband had been "apparently running around with Rhonda[ Chandler]." The

husband admitted that he had spoken often on the telephone to Rhonda Chandler from September to November 2020, but he denied having had a physical relationship with Chandler during that period. He stated that he had moved out of the marital residence in November 2020 and that the wife had continued to reside in the home. Chandler testified that she had known the parties since high school, that she and the husband had "had a friendship" from September or October 2020 until January or February 2021, and that they had traveled out of town together for the weekend in January 2021; however, when asked if her relationship with the husband had ever become romantic, she said: "No, not really." Chandler stated that she had had the wife arrested in March 2021 for assault, trespassing, and stalking based on the wife's having physically attacked her, having run her off the road, and having broken into the cabin that she and the husband had been staying in when they went out of town together in January 2021.

The husband testified that, after he had filed for a divorce, the wife had taken $110,000 from one of the parties' bank accounts and that he had received approximately $40,000 back from the amount that she had taken. He testified that, in May 2021, he had paid $245,000 for a house

6

on Snider Avenue in Frisco City ("the Snider house"), where, he said, he continued to reside at the time of the trial. He stated that, at the time of the trial, the Snider house was valued at $245,000. The husband testified that, shortly after May 2021, he sold had Auto Spa Express for $1.7 million and that, after he had paid off the debt associated with the business in the amount of approximately $1.3 million and had paid the taxes associated with the sale, he had received a net amount of approximately $300,000.

In August 2021, the wife contracted COVID-19 and entered the hospital, where she remained until January 19, 2022. The husband testified that, after the wife became ill, Swish did not continue operating; he stated that the wife owed taxes to the State of Alabama for Swish, which, he said, had resulted in a lien being placed against the marital residence. In September 2021, when the wife was in the hospital, the wife's mother, Vicky Sims, via a power of attorney, executed a deed conveying the wife's interest in the marital residence to Hunter and the parties' two daughters because, the wife said, she had not been given much hope of survival and had wanted to ensure that the children's names were on the deed to the marital residence, along with the

7

husband's name, so that they would always have a home. The husband testified that, when the wife was released from the hospital in January 2022, he had moved back into the marital residence to help their daughters care for the wife; he later clarified that he "was not living" at the marital residence, but that he "was just staying over there" while his belongings remained at the Snider house.

The husband; Hunter; Sims; the wife's friend Laura York; and Hunter's aunt and the wife's friend Laura Salter presented testimony indicating that there had been a difference between the wife's physical and mental functioning before she had entered the hospital and after she was released. Sims stated that, at first, the wife was never left alone, but, she said, the wife had since improved such that she could get in the tub by herself, was no longer on oxygen, and was able to walk without assistance. Hunter testified that the wife had relearned to walk and had regained muscle strength through attending physical therapy. According to the husband, in March 2022, he had asked the wife to move into the Snider house to make it easier to care for her, so, he said, she and the parties' daughters had moved into the Snider house.

The wife testified that, when she moved into the Snider house, she did not think that the parties were still going to divorce; she continued to reside at the Snider house at the time of the trial. Hunter testified that he had also believed that, when the wife moved into the Snider house, she and the husband were not going to divorce. The husband stated, however, that he had "never told [the wife] the divorce was off." Hunter testified that the husband had telephoned him in March or April 2022 and had offered to allow him to purchase the marital residence for $150,000. According to Hunter, he had agreed to purchase the marital residence because he had believed that the husband and the wife were going to continue residing together at the Snider house and because the marital residence was "on family land." He testified that the husband's offer had not been for Hunter to purchase half of the marital residence or for Hunter to purchase the husband's interest in the marital residence; instead, he said, he had believed that the husband, who had been his stepfather for 28 years, had agreed to sell him the marital residence for $150,000. An appraisal valuing the marital residence at $235,000 was entered as an exhibit. Hunter testified that, after he had agreed to purchase the marital residence for $150,000, he had learned that there

were liens on the residence for the sales tax that was owed by Swish. He stated that he had agreed to pay half of the amount owed on the taxes on behalf of the wife, which he had believed to be $30,000, because the wife was unable to pay them in her condition. The wife was later able to negotiate the amount of the debt to $25,000. The husband testified that Hunter had purchased the marital residence for $176,000 in June 2022, that Hunter "got a deal," and that the husband had received a net amount of $150,000 from the sale after the taxes that were owed by the wife had been paid. According to the husband, he had used the amount that he had received from the sale of the marital residence to pay down his mortgage on the Snider house; he stated that he owed $35,000 on the Snider house at the time of the trial.

The husband testified that, in July 2022, he had invested a little over $100,000 that he had earned from selling Auto Spa Express to open a restaurant, The Big Potato Company, an LLC that was owned solely by him. The husband stated that the wife and their daughters worked at The Big Potato Company, that its fair market value at the time of the trial was approximately $150,000, and that he had not received any income from The Big Potato Company since its inception but that he had

paid the wife and their daughters for working there. The wife testified that her job duties at The Big Potato Company included warming up the meat, filling bottles with sauces, and lining up plates. She stated that she would "sometimes" take orders but that it was hard for her to take orders, that she would sometimes "get stuck" and would be unable to properly make change for customers, and that, on those occasions, she would ask the parties' daughters to help her. According to the wife, at the time of the trial, the husband was paying her $265 to $300 per week for the work she performed at The Big Potato Company; she stated that her income is not taxed by that LLC.

Sims testified that, at the time of the trial, the wife had not fully recovered from her hospitalization; she stated that the wife still moved slowly and that her memory was slow, that she had seemed confused and frustrated at times, and that it was hard for the wife to make decisions. She stated that the wife could not run a business by herself. Laura York and Laura Salter both testified that the wife's cognitive ability and memory had declined, and Salter stated that, when she had seen the wife shortly before the trial, the wife had been unable to understand how to operate her cellular telephone. Salter also testified that the wife

11

continued to struggle with performing routine tasks. The husband also acknowledged that the wife had seemed to be confused on some days, but he stated that she was improving. He acknowledged that the wife had not driven a vehicle since she had been released from the hospital. The wife testified that the parties' daughters drive her to work and to her ongoing doctor appointments, including visits to a pulmonologist, a psychiatrist, and a neurologist. She stated that she was not comfortable and confident enough to drive at the time of the trial because of the state of her reflexes and her mind. According to the wife, the husband had sold her vehicle to purchase a truck for himself. The husband testified that he had sold a 2019 Dodge truck that he had owned at the time he commenced the divorce action and that, at the time of the trial, he owned a 2012 Colorado pickup truck that, he said, was worth $7,000 or $8,000, and a 2012 GMC 1500 pickup truck, which he said was worth approximately $20,000. The husband testified that he had used funds from the sale of Auto Spa Express to purchase a 2023 Volkswagen Atlas for the wife for $48,000 and a 2023 Toyota 4-Runner sport-utility vehicle for the parties' youngest daughter, which, he said, was titled in the daughter's name.

The husband testified that he had $139,000 remaining in the bank from the sale of Auto Spa Express. He stated that, in addition to the debt that he had paid on behalf of the wife from the sale of the marital residence, he had also paid $30,000 to the First National Bank of Excel that the wife had owed for her business and that the wife had paid a debt to United Bank that she had owed out of the $70,000 that she had removed from the parties' bank accounts. The wife testified that she had received a loan for her business from United Bank and that later she had received a loan from First National Bank of Excel for her business in the amount of $15,000. She stated that she had used the $70,000 that she had taken from the parties' bank account on groceries; on items that she had purchased for her daughter's dorm room; to pay her attorney's fees, which, the wife said, were later returned to her; on a trip to Walt Disney World; and on Botox, among other things. The husband testified that the wife had last worked for a business that was not owned by him at least 15 years before the trial. The wife stated that she did not think that she could work at a business that was not owned by her family. She testified that she did not know how she was going to survive moving forward after she was no longer residing with the husband. Hunter testified that he

was going to allow the wife to live with him, that "[s]he's got to have somewhere to go," and that "[s]he can't make it off $250 a week."

According to the wife, the husband had made purchases during the marriage as though the family had had plenty of money, but, she said, he had controlled the family's finances. She stated that she did not think that the husband had been truthful about his assets and that she had not received any of the money from the sales of the parties' businesses. The husband testified that, when he had worked at Airport Collision, he had purchased a dog for $4,000 and had spent an additional $26,000 on training for the dog. He stated that, at the time of the trial, he owned a kit to build a helicopter, for which he had paid $16,000; had a lawn mower that was worth $5,000; owned a pontoon boat with the wife's father for which the husband's portion was valued at $2,500; owned a small boat worth approximately $4,000; and had a Polaris Ranger utility-task vehicle that he valued at $7,000. The husband testified that he had a safe that holds some guns and approximately $2,000 in cash; he stated that he and the wife had split the cash that was in the safe shortly after he had filed for a divorce.

14

Analysis

The wife first argues on appeal that the trial court's division of the marital assets was inequitable. In its August 5, 2023, order, the trial court awarded the husband, among other things, the 2012 Colorado pickup truck and the 2012 GMC 1500 pickup truck, the Snider house and all personal property therein, and his ownership interest in Monroe Auto Glass. The wife was awarded all personal property in her possession not otherwise described in the judgment, the 2023 Volkswagen Atlas, the ownership interest in The Big Potato Company, and $70,000 from the parties' bank account to be paid within 30 days of the judgment. The trial court noted that the wife had taken $70,000 from the parties' accounts and that it was allowing her to keep any funds remaining from that amount of which she still had possession; it also noted that it had considered the tax liens and business debts that had been paid as having been paid on behalf of the wife. The trial court directed the wife to exit the Snider house within 30 days and divested her of any rights therein; awarded each party one-half of the future payments made on the sale of Airport Collision; and directed each party to be responsible for all debts in his or her own name. Regarding the wife's request for alimony, the

15

trial court stated: "Alimony is not awarded. The [husband's] earnings are only $35,000 per year and the [wife] will have future earnings from The Big Potato Company business. The [wife] has recovered from her COVID illness and currently works each day at The Big Potato Company."

> "'The issues of property division and alimony are interrelated, and, therefore, they must be considered together on appeal. Albertson v. Albertson, 678 So. 2d 118, 120 (Ala. Civ. App. 1996). When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment as to that evidence is presumed correct on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong. Roberts v. Roberts, 802 So. 2d 230, 235 (Ala. Civ. App. 2001); Parrish v. Parrish, 617 So. 2d 1036, 1038 (Ala. Civ. App. 1993); and Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986). A property division is required to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court. Parrish, 617 So. 2d at 1038. In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties' marriage; and the source, value, and type of marital property. Robinson v. Robinson, 795 So. 2d 729, 734 (Ala. Civ. App. 2001).'

16

"Stone v. Stone, 26 So. 3d 1232, 1236 (Ala. Civ. App. 2009)."

Edwards v. Edwards, 377 So. 3d 535, 540 (Ala. Civ. App. 2022).

The wife argues that the division of the marital estate was inequitable because, she says, the judgment fails to account for the parties' respective earning capacities and the liquidity of the funds available to the wife. The evidence presented indicates that the trial court awarded the husband assets totaling approximately $530,500[1] and

---

[1]This amount was reached by adding the amount of the husband's equity in the Snider house ($245,000 value - $35,000 mortgage = $210,000); the $120,000 in the parties' bank accounts at the time the divorce complaint was filed (subtracting from the total of $190,000 the $70,000 that the wife had removed from the accounts); the $69,000 that the husband was permitted to keep from the $139,000 remaining in the account from the sale of Auto Spa Express (the wife having been awarded the remaining $70,000); the combined value of $27,000 for the husband's vehicles; $70,000 as the amount the husband will receive from the remaining monthly payments due from the sale of Auto Spa Express; $2,500 for his share in the pontoon boat; $4,000 for the other boat; $7,000 for the Polaris Ranger utility task vehicle; $16,000 for the helicopter kit; and $5,000 for the lawnmower. ($210,000 + $120,000 + $69,000 + $27,000 + $70,000 + $2,500 + $4,000 + $7,000 + $16,000 + $5,000 = $530,500). We decline to consider the dog purchased by the husband because no evidence of the dog's value at the time of the trial was presented and we decline to consider the dog's training as a divisible marital asset, as asserted by the wife on appeal. Additionally, because the husband testified that he and the wife had divided the parties' cash holdings in the safe and there was no value presented regarding the guns

17

that it awarded the wife assets totaling approximately $463,000.[2] In consideration of those amounts, it appears that the husband was awarded approximately 53 percent of the marital estate and that the wife was awarded approximately 47 percent of the marital estate. We cannot conclude that those awards are so disproportionate that the trial court erred in its division of the marital property. To the extent that the wife asserts that the trial court erred in failing to consider the amounts that had been paid in monthly installments from the sale of Auto Spa Express before the division of the remainder amongst the parties, we note that the husband testified that he had expended those funds to pay marital bills. Both parties acknowledged that the husband had paid the expenses

---

in the safe, we decline to consider the values of the items in the husband's safe.

[2]This amount was reached by adding the $25,000 that was paid off on behalf of the wife from the sale of the marital residence; the $30,000 that the husband testified he had paid in settlement of debts from the wife's business; the $70,000 that the wife had removed from the parties' bank accounts following the filing of the divorce; the $70,000 that the wife was awarded from the $139,000 remaining in the bank account from the sale of Auto Spa Express; the $150,000 value of the Big Potato Company; the wife's $48,000 vehicle; and $70,000 as the amount the wife will receive from the remaining monthly payments due for the sale of Auto Spa Express. ($25,000 + $30,000 + $70,000 + $70,000 + $150,000 + 48,000 + $70,000 = $463,000).

for the family; thus, the trial court could have considered that the husband's use of the monthly installments from the sale of Auto Spa Express to pay expenses had benefited both the husband and the wife during the pendency of the divorce.

The wife also argues that the trial court's award fails to consider the earning capacities of both parties and the wife's diminished physical and mental abilities resulting from her illness. We note, however, that the trial court could have considered that the source of many of the marital assets were from the husband's business endeavors and balanced that factor against the parties' respective abilities at the time of the trial. Evidence was presented indicating that, before the wife contracted COVID-19, she had run her own business, and the wife had requested that she be awarded The Big Potato Company. Testimony from the husband, Hunter, and Sims indicates that the wife's condition had progressively improved since she was released from the hospital. The trial court could have considered that evidence in fashioning its property division. The wife also argues that the trial court's division of the marital property was inequitable based on the husband's conduct regarding his relationship with Chandler. We note, however, that both the husband

and Chandler denied the existence of a romantic relationship between them, and the trial court could have considered, alongside the evidence indicating that the husband and Chandler had traveled away for a weekend together after the husband filed his complaint for a divorce from the wife, that the wife had been arrested based on her conduct toward Chandler around that same timeframe. Thus, we cannot conclude that the trial court erred in dividing the marital property in consideration of the parties' conduct.

The wife next argues that the trial court erred by failing to award her alimony or by failing to reserve jurisdiction to award her alimony in the future. Section 30-2-57(a), Ala. Code 1975, provides:

> "Upon granting a divorce or legal separation, the court shall award either rehabilitative or periodic alimony as provided in subsection (b), if the court expressly finds all of the following:
>
> "(1) A party lacks a separate estate or his or her separate estate is insufficient to enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage.
>
> "(2) The other party has the ability to supply those means without undue economic hardship.
>
> "(3) The circumstances of the case make it equitable."

The wife argues that she established each of the three factors required in § 30-2-57(a) such that the trial court erred in declining to award her alimony. She asserts that she was "accustomed to living a comfortable life where the husband controlled all finances and paid all bills." The wife's brief, p. 50. The evidence indicates that, at the time the husband filed for a divorce, both parties were running businesses owned by either one or both of them; they resided in a home worth $235,000 to $300,000; both parties had vehicles, all of which were free of debt; the parties had $190,000 in bank accounts; and the husband was able to afford certain luxuries, including boats and a helicopter kit. The evidence was uncontroverted that the husband had handled the parties' finances and had paid the bills for the family.

Among the factors a trial court shall consider in determining whether a party has a sufficient separate estate to preserve the economic status quo of the marriage are the marital property awarded to the party, the liabilities of the party, and the party's wage-earning capacity. Ala. Code 1975, § 30-2-57(d). The wife challenges the trial court's finding that she had "recovered from her COVID illness and currently works each day

at The Big Potato Company." The wife's brief, p. 34. We agree with the wife that the evidence presented indicates that she had not fully recovered from her illness at the time of the trial. As discussed above, however, testimony was presented indicating that the wife's condition following her illness had progressively improved, that the wife had requested that she be awarded The Big Potato Company, and that the wife had run a company during the marriage. Additionally, the wife was awarded at least $70,000 in liquid funds in the divorce judgment, a vehicle with no associated debt, and a business valued at $150,000. There is no indication that the wife had any debts owing at the time of the trial. The husband testified that he had not received any income from The Big Potato Company as its owner, and the wife's earnings from The Big Potato Company were between $265 and $300 per week. Additionally, the wife will receive $1,250 per month from her share of the $140,000 that remains owing from the sale of Auto Spa Express, which monthly payments will continue for at least another 4 years.

Assuming, without deciding, that the trial court could have determined that the wife could temporarily maintain the marital standard of living based on the income that she will be receiving from the

22

monthly payments from the sale of Auto Spa Express and any income that she will be receiving from her ownership of and employment by The Big Potato Company, we conclude that the evidence presented indicates that, if her circumstances persist, the wife is likely to require additional monetary support in the future. There was no definitive testimony presented indicating that the wife's physical or mental condition was likely to improve such that the wife could effectively run a business as she had before her illness or that The Big Potato Company would yield income in the future in an amount that would allow the wife to reach the economic status enjoyed by the parties during the marriage.

Additionally, although the husband testified that his income at the time of the trial was limited, the evidence indicates that the husband's ability to pay alimony could change in the future. Among the factors a court shall consider in determining whether a party has the ability to pay alimony are a parties' individual assets, the marital property awarded to him or her, his or her net income, and his or her wage-earning ability. Ala. Code 1975, § 30-2-57(e). In the present case, the husband was awarded assets with significant value, as discussed above. Although the husband testified that he earns only approximately $30,000 to $35,000

23

per year, evidence was presented indicating that his earning capacity is greater, including his having created, run, and sold businesses that had allowed the parties to become debt-free during the marriage and him the ability to afford luxury items while managing the family's ordinary expenses during certain periods.

Section 30-2-57(c), Ala. Code 1975, provides:

"In cases in which a party has proven a lack of means to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage, but there exists a present inability of the other party to supply those means, a court, when the circumstances of the case make it equitable, shall reserve jurisdiction to award rehabilitative or periodic alimony. If there is neither an award of alimony nor a reservation of jurisdiction at the time of the divorce, the court shall permanently lose jurisdiction to subsequently make an award of rehabilitative or periodic alimony."

The evidence presented indicates that, based on the circumstances as they existed at the time of the trial, the wife would be unable to acquire the ability to preserve the economic status quo of the parties as it existed during the marriage unless a change of circumstances occurs and that the husband's circumstances also have the potential to change regarding his ability to pay alimony. Accordingly, we conclude that the trial court erred in declining to reserve jurisdiction to make an award of alimony to

the wife in the future. We, therefore, reverse the trial court's judgment on that basis and remand the case for the entry of a judgment consistent with this opinion.

The wife last argues on appeal that the trial court erred in denying her contempt motion. The husband admitted that he had failed to obtain permission for the sale of Auto Spa Express from the trial court in accordance with the pendente lite order. The wife asserts that, in addition to selling that business, the husband had also purchased a residence and vehicles in violation of the trial court's pendente lite order. "The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court's contempt determination will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that its judgment is not supported by the evidence." Poh v. Poh, 64 So. 3d 49, 61 (Ala. Civ. App. 2010). In Hall v. Hall, 895 So. 2d 299 (Ala. Civ. App. 2004), this court affirmed a judgment declining to hold a party in contempt for the violation of a pendente lite order, in part, because there was evidence presented indicating that both parties had violated the trial court's orders. This court stated, in pertinent part:

"Because both parties could have been held in contempt, the trial court did not abuse its discretion by declining to hold the wife in contempt.

"'It is for the court to decide whether breaches by one party should excuse performance by the other, or whether the court should exercise its contempt powers against either or both. Scott v. Scott, 401 So. 2d 92 (Ala. Civ. App. 1981).

"'Based upon the record, it is clear that each of the parties has "failed to fully comply with the spirit and letter of the divorce decree." Broadnax v. Broadnax, 558 So. 2d 929, 930 (Ala. Civ. App. 1989). A contempt finding relating to either one of them would have been warranted. However, we cannot say that the trial court abused its discretion in declining to hold the wife in contempt.'

"King v. King, 636 So. 2d 1249, 1252 (Ala. Civ. App. 1994)."

895 So. 2d at 302.

In the present case, evidence was presented indicating that, during the divorce proceedings, the wife had removed $110,000 from the parties' bank accounts despite the terms of the pendente lite order directing that the parties' assets be preserved and remain in their present location. Because both parties could have been held in contempt based on their apparent violations of the trial court's pendente lite order, we cannot

26

conclude that the trial court abused its discretion by declining to hold the husband in contempt.

<u>Conclusion</u>

We reverse the trial court's judgment insofar as it failed to reserve jurisdiction to award alimony to the wife in the future. We otherwise affirm the trial court's judgment.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Hanson and Fridy, JJ., concur.

Edwards and Lewis, JJ., concur in the result, without opinions.